Judge Carr,
This is a bill of injunction to stay proceedings on a deed of trust executed by the plaintiff to secure a debt to the defendants. In his bill, the plaintiff claims several small credits, as omissions in the accounts presented by the defendants; but these claims are inadmissible, as the plaintiff has settled the whole account, and acknowledged its correctness, twice at least; in 1803, when he settled with M’Credie, and executed his bond, and in 1806, when he executed a .deed of trust to secure the debt then under the direction of Breckenridge; and there is no evidence whatever, that either of these settlements was procured by fraud, or any kind of concealment or misunderstanding.
Passing by these small items, we will consider the important question in the cause; that is, ought the plaintiff to receive a credit on his debt to the defendants, of 5721. 4 1 sterling, the amount of two bills of exchange, drawn by George Lynham, on Walter Burrows of London, in favor of Pate; by him endorsed in blank, and delivered to Alexander M’Clure, by whom they were endorsed to Mill°r, Hart fy Co. or order. The circumstances are briefly these. Lynham had had property taken on the -high seas, by the cruizers of Great Britain. He had made *168 Burrows his agent, to solicit compensation from that government for these spoliations; and in the hope that he might have received funds from that source, he drew the bills on which he passed to Pate in payment for tobacco purchased of him. The bills were delivered to Alexander M’Clure, in the early part of September, 1799. They were payable at 90 days sight. On the 21st of October, 1799, it seems from a note of the notary public, that these bills were presented for acceptance, and dishonoured by a refusal to accept. Counting the 90 days from the 21st of October, the bills would be payable the 22d of January, 1800. They were regularly presented for payment, refused and protested; as we see by a copy of them in the record. On the 2d of February, 1800, M’Clure informs Pate by letter, that the bills are refused acceptance, and are not likely to be paid when due: that they were due in January, and -might be expected in March or April: that Lynham has some property, and will pay, if able; but as he is informed, there are other bills in the same predicament, he asks instructions how he shall act most for Pate’s interest, and most likely to prevent loss. “ For instance, (he says,) he may be unable to pay money, and willing to give West India produce, or some other equivalent, which I might, from a knowledge of his situation, be induced to accept, rather than run any further risque by delay; and you may be assured, I will do for your interest, as I would for my own.” There is no answer to this letter in the record. On the 21st of March, 1800, M’Clure writes to Pate, that he has no idea the bills will be paid, and is daily expecting to receive them under protest, when he will do his best to recover them;, but in the mean time, the advance is heavy and severely felt, .and he therefore expects that Pate will pay up his debt, in the course of the spring. On the 21st of June, 1800, M’Clure writes Pate, that not a shilling is paid on the returned bills, and presses him for payment. On the 20th of October, he writes to him pressing payment, and says nothing has been gotten of Lyn *169 ham: that two of his vessels had been taken, and one returned in ballast: that there was no species of property he could get bold of, though he had left nothing untried. On the 2Cth of June, 1801, Pate writes to M’Clure, stating how hardly he is pressed by the protest of Lynham’s bills: that he had better have given away the tobacco; expresses a hope that something might still be gotten from him; begs indulgence, and promises the best payments he can possibly make.
I have given thus much of the correspondence, to shew, that on the protest of the bills, M’Clure immediately looked to Pate for their amount, and that Pate explicitly acknowledged himself liable, and promised payment: that in every thing M’Clure did, towards attempting to get the amount of the bills from Lynham, he considered himself acting as the friend and agent of Pate, and that Pate also considered it in the same light. Many more letters are in the record, going to prove the same points; but it is useless to notice them farther. Pate, in 1803, gave a new bond, including the amount of the bills. In 1806, he gave a deed of trust on land, to secure the same debt. By various promises of selling the land and making payment, (as Brecleenridge states in his answer,) he gained time, year after year, till 1812; and it was never till after his land was advertised for sale, that the objections to payment, and the claims of credit stated in his bill, seem to have been thought of.
It is now objected, 1st, that there is no evidence in the record, that he had a regular and timely notice of the protest, and that, therefore, he is released from paying the bills: 2dly, that M’Clure has been negligent in his agency, has acted fraudulently, in concealing the loss of the bills; and that on this ground also, Pate is released.
As to the first, Alexander M’ Clure says, in direct response to a particular interrogatory in the bill, that immediately on the return of the bills, he gave due notice of the protest, both to Lynham and Pate; and this is strongly *170 corroborated by the correspondence. But in truth, the case is taken wholly off that ground, by the various subsequent promises to pay, and acts of sanction and ratification given and done by Pate; promises and acts, covering an interval of twelve years, and done in the most solemn manner, with full knowledge of the facts. After this, it is equally repugnant to reason and to law, that he should claim to be discharged for want of notice, and call on the other party to prove that he proceeded in strict conformity with all the niceties of the law merchant. If he had intended to place himself on this ground, the time for it was, when the bills came back, and he was pressed for payment of them. He should then have said, “shew that in all things, you have proceeded strictly; that the bills have been regularly protested, and due notice of protest given to me.” Nor will it avail him to say, that he was ignorant of the law; every man is bound to know the law.
The cases on this subject, in the English books, are abundant; and there is also one in this Court, on the very point. It is Walker v. Laverty, &c. 6 Munf. 487. Debt on a protested bill of exchange against John C. Walker of the firm of Walker 8? Co. The declaration states the drawing, the presentation and protest of the bill, of which defendant had notice, &c. (in the usual form of declarations in such cases.) Plea, nil debet. On the trial, the defendant required proof of notice of protest for non-payment of the bill. The plaintiff introduced a witness, who proved, that he applied to the defendant for payment of the said bill, who acknowledged that the debt was a just one, and said he would pay it. But, nothing was said as to his receiving notice or not. Defendant then moved the Court to instruct the jury, that unless the acknowledgment was made, with a knowledge of all the facts in the case, as to the laches of the holders of the bill, the evidence of acknowledgment was not to be received; which opinion the Court refused to give, and instructed the jury that such acknowledgment was a waiver of notice. Defendant except *171 ed, and a verdict being found against him, brought the case up by Supersedeas, contending that the Superior Court erred in not giving the instruction asked for by hini, and referring in his petition to Blesard v. Hurst, 5 Burr. 2672. Goodall &c. v. Dolly, 1 Term. Rep. 712, and 12 East. 38. This Court, after argument, affirmed the judgment. As the Court do not state the reasons or the authorities on which they found their opinion, I will shew by a reference to some of the cases, that they haye full authority for the decision.
In Bilbie v. Lumly, 2 East. 469, an underwriter had promised payment, with a knowledge of facts which would have released him from his contract, and afterwards attempted to avoid the promise on the ground of ignorance of the law. The Court said, “every man must be taken to be conusant of the law. Otherwise, there is no saying to what extent the excuse of ignorance might be carried. It would be urged in almost every case.”
Lundie v. Robertson, 7 East. 231. Suit against an endorser, who relied on want of notice. Lord Ellenborough said, “the case does not admit of a doubt. The defendant is charged as endorser of a bill of exchange. When applied to for payment, he says, he has no cash by him, but if the witness will call again, he will pay it. Now, when a man, against whom there is a demand, promises to pay it; for the necessary facilitating of business in transactions between man and man, every thing must be presumed against him. It was therefore to be presumedprima facie, from the promise, that the bill had been presented for payment in due time, and dishonoured; and that due notice of it had been given to the defendant.”
Stevens v. Lynch, 12 East. 38. The drawer of the bill, knowing that time had been given, but apprehending that he was still liable, three months after it was due, said, “ I know I am liable, and if the acceptor does not pay it, I will.” The Court said the defendant had made the promise with full knowledge of the facts, three months after *172 the bill had been dishonoured, and could not now defend himself upon the ground of his ignorance of the law.
Potter v. Rayworth, 13 East. 417. A note was made payable to order of defendant, who endorsed it and delivered it to Fitlford. It passed through several hands, and some time elapsed after its dishonour, before the defendant heard of it. At length, one Kirton, who then held it, applied to the defendant, and he promised payment. He failed to pay, however, and Kirton had recourse to his immediate endorser, who paid him, and then sued the defendant as first endoi’ser. He relied on want of notice. The plaintiff relied on the promise made to Kirton, either asan admission of due notice, or a waiver of notice. It was insisted on the other side, that the promise being to a third person, and not in the plaintiff’s presence, the case was not within the principle of Lundie v. Robertson. The Court held, that whether the promise were made to the plaintiff, or any other who held the note, it was equally evidence, that the defendant was conscious of his liability to pay; and must be considered either as an acknowledgment that he had due notice, or that without such notice, he was the proper person to pay.
The cases of Gibbon v. Coggin, 2 Camp. 188, and Jones v. Morgan &c. 2 Camp. 474, are also very strong to'this point. In the former, Lord Ellenborough says, “ by Colbourn’s promise to pay, he admits his liability; he admits the existence of every thing necessary to render him liable. When called on for payment of the bill, he should have objected that there was no protest. Instead of that, he promises to pay it. I must therefore presume, that he had due notice, and that a protest was regularly drawn up by a notary.” See also Pierson v. Hooker, 2 Johns. Rep. 68, and the cases cited in the note. I consider it clear from these authorities, as well as the reason of the case, that the plaintiff has no right to'object on the ground of the failure of M’ Clure to proceed regularly with notice of protest, &c<
*173 As little foundation is there, in my opinion, for the objection, that the negligence of M’Clure in his agency, or the loss of the bills, or his concealment of that loss, ought to release Pate from the payment of them. As to the loss of the bills, M’Clure was chargeable with no neglect on that score, for his store was broken open, and his strong box taken off, in which the bills were deposited; and where, it is in evidence, that merchants often keep valuable papers. But the loss could be of no serious injury, because notarial copies, with proof that th.e orignals were lost, would be sufficient for every purpose. It is in full proof, that from the time of drawing the bills, or shortly thereafter, till he left Norfolk in 1802, Lynham was insolvent: that he left many creditors unsatisfied, who were so confident of his inability to pay, that they gave him a letter of license to leave the country, and promising not to molest him for five years. The only possible chance for recovering the money of him, seems to have been the claim on the French government, which was allowed and paid at the treasury in Washington. • But I can see no ground for charging M’Clure with negligence on this point. There is no evidence that he ever heard of it ’till 1806, and the money was paid to Lynham’s order in 1805. None of his numerous creditors in Norfolk seem to have been aware of this fact, in time to avail themselves of it; and it would be hard measure to mete out to a voluntary and gratuitous agent, to hold him to greater diligence, and more efficient exertions, than those were capable of, who were stimulalated by the powerful motive of self-interest. We see too from the evidence, that Mexander M’Clure did write to his brother William, prior to his leaving France in 1808, making enquiries after Lynham &c. and that William did try to find him out, and could not. We also have it from • William, in his answer, that after his return to France in 1809 or 1810, he made enquiries after Lynham; that he Was told he had retired to the interior, somewhere in the vicinity of the Pyrenees, utterly insolvent: that William *174 knew the notary in London, who had protested the bills, and could with ease have gotten notarial copies from him, which he would have done, if he had seen any prospect of benefitting Pate. From these considerations, it is perfectly clear to me, that Alexander M’ Clure was guilty of no such negligence as would make him chargeable: that Lynham was utterly insolvent, so that no injury could result to the plaintiff from any negligence, from the loss of the bills, or the failure to disclose that loss to Pate; and that there is no ground for this second objection.
It was objected in the argument, that the Chancellor erred in supplying the place of the trustee, who had died pending the suit, and in committing the execution of the trust to the marshal, under the superintendence of the Court. I have reflected a good deal upon this point, and examined the cases. Upon the reason and the practice, I cannot think the thing wrong. The parties had submitted their case to the equity of the Court. The Chancellor had arrested the proceedings in the country. This was done at the instance of Pate by bill of injunction, making such a case, as the Court of Equity thought justified its interference. The case was fully developed, and it appeared finally, that the plaintiff’s injunction was wholly unsupported. The Chancellor decided all the points against him; and it was clear that he ought, in good conscience, never to have come into equity, to arrest the proceedings of the trustee. In the mean time, this trustee had died-, and though the deed was to him and his heirs, the trust was a personal confidence placed in him. Who his heirs were, whether infants or adults, does not appear. The Chancellor was either to dismiss the bill and leave this matter in doubt and uncertainty, or to supply the place of the’trustee, and thus place the parties as nearly as might be, in the situation they would have occupied, if the case had not been brought before the Court. The right to make such substitution by motion, and without putting the parties, who were all before the Court, to new pleadings, seems to *175 me fairly to belong to those powers, which Courts of Equity, in order to do complete justice, exercise in all cases be-' fore them; and more especially, in injunction cases. If the trustee had continued in life, and there had been no objection to him on the score of interest, misconduct, or any other sufficient ground, I would by no means be understood to say, that the Chancellor could, of his own mere motion, set him aside, and put the execution of the trust into the hands of the marshal. This would be to deprive the parties against their will, of a trustee, to whom they had both confided the business, as their confidential friend, and to subject them to the commissions of the marshal, when that friend could probably execute the trust without expense. The case here is wholly different. The creditor has been deprived of the services of the trustee, by the interference of the Court, at the instance of the plaintiff; and the question is, cannot the Court, at the request of the creditor, and when the plaintiff makes no objection that we see in the record, repair the mischief which its interference has produced? I think what Lord Eldon says, in Pultney v. Warren, 6 Ves. 93, very applicable to this case. Speaking of the injury which had resulted to a party from an injunction granted by the Court, he says, “ If there be a principle, upon which Courts of Justice ought to act without scruple, it is this; to relieve parties against that injustice occasioned by its own acts or oversights, done at the instance of the party against whom the relief is sought.” He then cites a case from Shower, where a party came into equity to be relieved from a bond, which was sued on at law. The litigation was drawn out into such length, that before the decision, the principal and interest far exceeded the penalty of the bond; and the Court of Equity, finding that the injunction was unfounded, and the bond justly due, decreed that the plaintiff should pay the whole principal, interest and costs. Duval v. Terry, Show. Parl. Cas. 15. Commenting upon this case, he says, “by the mere circumstance of filing the bill, the plaintiff would *176 be taken to submit to every thing conscience and justice require. Upon that principle, he would be held to do that which is just; and the Court, duly acting with him, would compel him to pay the principal, interest and costs, occasioned by his delay. It may be said,” he adds, “ that this is a relief against a plaintiff coming for relief. I consider these persons as plaintiffs, asking an injunction, and impliedly saying, they ask it upon the terms of putting the plaintiff (at law,) in exactly the same situation, as if it had been determined they were not entitled; for otherwise, there is no colour of justice in calling upon the Court to discuss the question, whether they are entitled to equitable relief. These, it seems to me, are sound principles, and very applicable to the case before us. There are also several cases in this Court, where the Court in order to render complete justice, have gone quite as far as the Chancellor has done in this case. I will only refer to the cases by name. Todd v. Bowyer, 1 Munf. 447. Fox v. Taliaferro, 4 Munf. 243. West v. Belches, 5 Munf. 187. Ball’s devisees v. Ball’s ex’rs. and widow, 3 Munf. 279; and Humphreys’ adm’r. v. M’Clenachan’s adm’r. 1 Munf. 493, a very strong case.
It was also objected, that the decree was erroneous, in giving to the person who might' purchase the land at the sale by the marshal, the benefit of the bond executed by Pate and his brothers to M’Clure §• Co. and conditioned to remove the lien of Galt on the land. But I think this part of the decree perfectly correct, and so clearly equitable, that I rather think it would have followed without the decree. Nor can the sureties complain; for, it does not change their situation, nor affect any defence they may have against the bond.
Thus far, I think the Chancellor correct. But there is one part of the decree, from which I feel compelled to dissent. It is that which suspends the sale, till the defendants, or some one for them, shall give bond in the sum of g 6000, conditioned to pay the plaintiff all such damages *177 as he may recover of them, on account of the conduct of the defendant Alexander, touching the bills of exchange. I think the whole record shews, that the plaintiff has suffered no damages whatever from the conduct of Alexander; and though I would leave the plaintiff free to bring any suit he may choose, there does not seem to be the least ground for subjecting the defendants to give the bond.
I am of opinion, therefore, that this part of the decree be reversed, the residue affirmed,, and that the cause be remanded to be proceeded in accordingly.
The other Judges concurred, and a decree was entered in pursuance of the foregoing principles.*