# CHARLESTON.

## THOMPSON v. CURRY *et al.*

Submitted February 27, 1917.   Decided March 6, 1917.

1. BILLS AND NOTES—*Indorser—Liability.*

   A person who otherwise than as maker, drawer or acceptor places his name upon a negotiable instrument, executed according to the uniform negotiable instruments law, is deemed to be an indorser, unless by appropriate words he indicates an intention to be bound in some other capacity.   (p. 772).

2. SAME—*Indorser—Contract.*

   The contract of one who so indorses a negotiable instrument, drawn under that act, is, as at common law, upon the sole condition that he will pay the obligation if the maker fails to pay it when due.   (p. 774).

3. SAME—*Liability of Indorser—Presentation.*

   But to render such an indorser liable, presentment for payment at the time and place designated in the paper and notice of dishonor are essential, unless he waives these requirements; and this he may do, expressly or impliedly, either before or after the maturity of the instrument.   (p. 774).

4. SAME—*Liability of Indorser—Waiver of Presentment—Evidence.*

   The facts herein proved, although as to them the testimony conflicts, held sufficient to show such a waiver after maturity.   (p. 775).

Error to Circuit Court, Lincoln County.

Action by Lawson Thompson against B. B. Curry, D. E. Wilkinson, Granville Curry, S. S. Johnson, and John W. McColgin.  Judgment for plaintiff against Wilkinson only, and plaintiff brings error.

*Reversed, and judgment for plaintiff.*

*Jacob Smith,* for plaintiff in error.

*A. F. Morris,* for defendants in error.

LYNCH, PRESIDENT:

The note sued on in this action, when delivered to the payee, showed on its face the names of B. B. Curry and D. E. Wilkinson as makers, and on the reverse side the names of

Granville Curry and S. S. Johnson and none others. It bears date January 1, 1912, and reads: "Twelve months after date we promise to pay to the order of John W. McColgin, without off-set, one thousand dollars, payable at the Lincoln National Bank of Hamlin, W. Va." As thus executed, McColgin, before maturity and without recourse, endorsed and delivered it to Lawson Thompson, who, without presenting it for payment on the date and at the place appointed therefor, afterwards brought assumpsit against the signatories named except the payee. The circuit court, by agreement of the parties, tried the case in lieu of a jury, and rendered judgment against D. E. Wilkinson only. Thompson complains because the court denied him the right to recover against S. S. Johnson and the personal representative of Granville Curry, who died pending the suit. The theory of the defense they proposed, the one apparently approved and adopted by the court in determining the rights of the parties, was that, under §63, ch. 98A, Code, they were indorsers, and as such relieved from liability because plaintiff failed to present the note for payment at the time and place fixed therein for that purpose and to give them formal notice of its dishonor. This he admits he did not do, and was not aware that it was necessary to do to bind them.

Nor were presentment and notice required at the common law, as interpreted by the courts of this state; because, as Granville Curry and Johnson placed their names in blank upon the back of the instrument before delivery, for the accommodation of the makers, the payee or his indorsee could, under the common law principles, elect to hold them as joint makers or as guarantors or indorsers. *Peters* v. *Nolan Coal Co.,* 61 W. Va. 392, and cases cited. The note was negotiable at common law; the indorsements were made before delivery and above the indorsement of the payee.

But, by section 63 of the negotiable instruments act, "a person placing his signature upon an instrument otherwise than as maker, drawer or acceptor is deemed to be an indorser, unless he clearly indicates by appropriate words his intention to be bound in some other capacity". And the next section adds: "Where a person, not otherwise a party to an

instrument, places thereon his signature in blank before delivery, he is liable as *indorser* in accordance with the following rules:  (1) If the instrument is payable to the order of a third person he is liable to the payee and to all subsequent parties; (2) if the instrument is payable to the order of the maker or drawer, or is payable to bearer, he is liable to all parties subsequent to the maker or drawer; (3) if he signed for the accommodation of the payee he is liable to all persons subsequent to the payee''; and further, by clause 6 of section 17, ''where a signature is so placed upon the instrument that it is not clear in what capacity the person making the same intended to sign he is to be deemed an indorser''.

These details of the act clearly identify Granville Curry and Johnson as indorsers, and this identification renders certain the capacity in which they joined in executing the instrument sued on.

The uncertain status of an irregular or anomalous indorser at the common law, as interpreted by the courts of the different jurisdictions, was, as generally agreed, one of the chief inducements for the movement that culminated in the adoption of the uniform negotiable instruments law by many of the states of the Union.  The varied interpretation of the relation that an indorsement in blank created, as between the apparent makers, indorsers and others, during the course of the instrument, operated as an impediment or obstruction to its commercial circulation and currency.  For if, as held in this state in the case cited, the payee or indorsee of such paper had the option to treat as a joint maker, guarantor or indorser one who signed his name in blank on the back thereof, his status was one of doubt and uncertainty wherever the paper found its way in commercial transactions, because other jurisdictions gave him a different status.  3 R. C. L., §§340-47; 8 C. J., §§118 *et seq.*

Giving to sections 63 and 64, Ch. 98A, Code, their logical and legitimate interpretation and effect, in view of the purpose of the whole act, the conclusion seems to be inevitable that where, before delivery to the payee, a person signs his name in blank on the back of an instrument in form negotiable, otherwise than for the purpose of transferring the title,

he is to be deemed as having consented to be bound in the capacity of an indorser and not otherwise, although under the common law rules his status may have been different. These sections fix and determine the exact relation he bears to the paper, when it passes by delivery to the payee; a relation that remains fixed and stable during the entire circulation of the instrument. Until it is paid, he occupies the position of an indorser, and, as such, is subject to the burdens imposed by that relation and entitled, to whatever protection it affords. That relation, its burdens and immunities are the same in all jurisdictions wherein the uniform negotiable instruments act has been enacted and now is in force. His liability is no longer susceptible of doubt or uncertainty. The statute fixes his status, a status wholly beyond the power of alteration or change at the option of the payee or any subsequent holder. Such indeed is, with one exception, the consensus of opinion, so far as expressed by authors and decisions dealing with the new form of legislation. *Baumeister* v. *Kunst,* 53 Fla. 340; *Hough* v. *State Bank,* 61 Fla. 290, Ann. Cas. 1912D 1200; *Williams* v. *Paintsville National Bank,* 143 Ky. 781, Ann. Cas. 1912D 350; *Haddock* v. *Haddock,* 192 N. Y. 490; *Rockfield* v. *First National Bank,* 77 Ohio 311; *Deahy* v. *Choquet,* 28 R. I. 338; *Bank of Montpelier* v. *Montpelier Lumber Co.,* 16 Idaho 730; *First National Bank* v. *Richel,* 143 Ky. 754; *Bainford* v. *Boynton,* 200 Mass. 560; *Toole* v. *Crafts,* 193 Mass. 110; *Perry Co.* v. *Taylor Bros.,* 148 N. C. 362; *Farquhr Co.* v. *Higham,* 16 N. D. 106. For other citations see 1 Daniel Neg. Inst. §714; *Rockaway Bank* v. *Norton,* 186 N. Y. 484.

So that, as so interpreted, and indeed as the act itself renders obvious, the persons whose names appear on the back of the instrument are indorsers. Their contract, as at common law, was upon the condition that they would pay the debt if the makers failed to pay it when due. But no liability attached unless when presented for payment at the time and place fixed in the contract payment was refused by those primarily liable, and notice of nonpayment was communicated to the indorsers, unless waived either expressly or impliedly before or after the maturity of the instrument. §109, ch. 98A, Code.

The trial of the case indeed proceeded upon the theory, advocated by the plaintiff, that, although Granville Curry and Johnson were indorsers entitled to notice of dishonor, they were nevertheless bound because before and after the maturity of the note they waived these requirements; and to establish or disprove waiver was the purpose of practically all the testimony introduced upon the trial of the case. Conceding the efficacy of the testimony introduced to show, a verbal promise of payment made by the indorsers after the dishonor of the instrument, of which it appears by their own admissions they had knowledge, the inquiry is whether the trial court erred in denying plaintiff judgment against them also, in view of the waiver provisions contained in section 109 that "notice of dishonor may be waived, either before the time of giving notice has arrived, or after the omission to give due notice, and the waiver may be express or implied".

Obviously there were negotiations among all the parties to the instrument before and after it became due, in anticipation of the makers' inability to pay it, owing to the loss by fire of their stock of merchandise before that date. While the testimony of Granville Curry and Johnson does not in every particular agree with that of the plaintiff in regard to what was said during these negotiations, yet on some phases of the transaction there is no discord between them. Johnson says: "I told" the plaintiff "to go and see Curry and Wilkinson in regard to the matter. I think he talked with Curry in the first place and then with Wilkinson, and came back and said he was not in shape to do anything. I told him to go to Mr. Wilkinson, and if he would give us a deed of trust over something to secure us we would make arrangements and get the money and pay the note off, and we would hold the trust until they could make arrangements to pay us". The context shows the presence of the plaintiff, Granville Curry and Johnson at the time referred to in the quotation. The evident purpose of the negotiations then in process, in contemplation of the continued liability of the indorsers, was to secure from Wilkinson a lien on his property to indemnify them as indorsers on the note of himself and B. B. Curry. Johnson further testified: "I don't know as Thompson made demand of me to

pay it. I told him we were talking about the matter. Q. Did he come to you and tell you he wanted the money on that note? A. I don't remember how the conversation came up. Q. Did you tell him you would or would not pay it? A. I don't think at that time I told him either way. I told him we would get the money if he would get D. E. Wilkinson to give us a deed of trust over real estate to make us safe". Granville Curry says: "I told him if the parties would give us a deed of trust and make us safe we would give a new note. * * I knew it had not been paid".

These questions were propounded and the answers given on the first trial. Upon the second trial Thompson, with some modification, repeated the conversations he had with the two indorsers. "I was down here somewhere between the first and middle of December on some other business, and Mr. S. S. Johnson spoke to me concerning this note, and asked me if I had ever spoken to Mr. B. B. Curry and D. E. Wilkinson concerning the matter, whether they were going to be able to pay that note when it was due January first or not, and I told him I had not but would do so before I went away, and I did speak to Mr. Curry". "Mr. Johnson asked me if I had spoken to them about the note, and he went on and stated to me that the note would be due January first, and he would like to find out what if anything they would be able to do with it". This conversation was had before the note became due. After it became due, he says: "I stayed over night at the house of Granville Curry", about three weeks after the note became due, "when we were going over to" Hamlin. "We were going over there, and we were to come together and see what could be done about the payment of this note and what kind of shape they were in"; that at that time, in the presence of plaintiff and Granville Curry, Johnson said he "did not think there was anything that Mr. B. B. Curry had they could get at, as his property was so wrapped up in mortgage liens or something like that, and that they did not think there was anything they could get at, or that he had anything they could make it out of, but Mr. Wilkinson had a lot of property that was not involved, and that they would make one more proposition and send for Mr. Wilkinson, and

that if he would give them a. deed of trust on some property of some kind worth the amount involved they would make a note to the bank and get the money and pay me, and as long as Mr. Wilkinson took care of the note they would give him time''. After Wilkinson declined to execute the trust, Thompson says: ''I returned back there and told what Mr. Wilkinson .said. Then they said to go ahead and bring suit on the note and what we couldn't make out of him they would pay; that they had been worried considerably about it and were getting anxious to settle this thing, and to go ahead and push it and have my attorney bring suit on the note and what I couldn't make out of Mr. Wilkinson they would pay me. * * * I think it was the same day when they ordered me to bring suit on the note, and I went ahead and put the note in the hands of an attorney. * * * I ordered that suit brought as they ordered me to do. * * * Mr. Johnson told me, 'now you live at Holden, some distance from here, and I feel interested in this matter', and he said, 'I will watch after the matter myself and if anything turns up or if there is any disposition of any property that I think is not right I will notify you or Mr. Evans' '', his attorney. ''I told him I would appreciate very. much if he would do so, that I was away from Hamlin, and was not handy here, and could not be here very often without considerable expense to myself, and I would appreciate it very much if he would do it''. Afterwards, ''I wrote to Mr. Johnson, but did not get any answer. I came down here, and went over to his store, and he came around and shook hands with me, and said, 'I didn't answer your letter', and he went on and told me the reason he did not, and he said he felt ashamed about it, and so he said he found since a hole to crawl out of, and he says, 'I am going to get out; there is no use to deny it any longer; I am going to get out of it, I am going off the note. I will be frank to tell you that I am going to get out of it, and that is why I did not answer your letter' ''. The correctness of this statement Johnson did not deny upon his second examination; and when asked, ''Did you or Mr. Curry say there at that time that you would pay the balance of this note that the plaintiff could not make off D. E. Wilkinson or B. B. Curry'',

he answered, ''I told him in a conversation there that if we had to pay any it would only be what Curry and Wilkinson couldn't pay; that would be the only part we would pay''. Of course, the liability of the indorsers, being secondary, extended only to such balance. But he added that if Thompson ''would get Mr. Wilkinson to give us a deed of trust over some property to make us safe Mr. Curry and I would execute our note at the bank to get the money and pay him, but I did that to accommodate Mr. Thompson''; ''I just done that to accommodate Mr. Thompson''. And Granville Curry said: ''The only promise or conversation I had with Lawson Thompson, or rather I made a statement to Lawson in which I told him if the balance would pay their part I would pay mine, on condition they would pay their part I would pay mine''.

While these quotations do not contain all the testimony introduced on the question of waiver, they do fairly represent what was said by the parties during the negotiations between them immediately before and after the date on which the obligation matured. And when it is remembered that, as the evidence clearly shows, the indorsers then knew the note was not paid nor presented for payment when due, the question arises whether from the testimony there was such a waiver by them of the failure to make presentment and demand for payment and give notice of dishonor as still continued their liability in force.

The authorities are abundant to the effect, and the statute itself indicates, that an effectual waiver may occur either before the time for giving notice has arrived or after the omission to give due notice, and that the waiver may be express or implied; and, further, that no consideration is necessary to make it effectual. An indorser other than one who transfers the title can, after the instrument is due, waive proof of demand and notice, or, what is important here, ''he may so act towards the holder of the note as to render the fact that demand was not made or notice given wholly immaterial.'' *Yeager* v. *Farwell*, 13 Wall. 6; *Hoadley* v. *Bliss*, 9 Ga. 303; *Harrison* v. *Bailey*, 99 Mass. 620; *Sparham* v. *Carley*, 8 Man. 246; 8 C. J. 698. ''A parol promise by the indorser of a

promissory note to pay the same, made without being misled, after maturity of the note, and with the knowledge that there has been no demand for payment upon the maker or notice of nonpayment given to himself as indorser, and of all other material facts, is a waiver of want of demand and notice, and renders him liable on the note, without a new consideration, although the note was payable on demand and he does not know that upon such a note the law required demand and notice." *Mathews* v. *Allen,* 82 Mass. 594; *Lockwood* v. *Bock,* 50 Minn. 142. *Third National Bank* v. *Ashworth,* 105 Mass. 503, states the same proposition; and *Rindge* v. *Kimball,* 124 Mass. 209, says a waiver is as effectual after as before maturity of the note. As early as 1820, the supreme court of Virginia, in *Walker* v. *Laverty,* 6 Munf. 487, a decision binding on this court, held that if a drawer of a protested bill of exchange, being applied to in behalf of the holder for payment, acknowledges the debt to be just and promises to pay it, saying nothing about his having received notice, the holder in an action of debt upon the bill against such drawer is not bound to prove that notice was given to him of the protest. This decision was followed in *Pate* v. *M'Clure,* 4 Rand. 164. And in *Peabody Insurance Co.* v. *Wilson,* 29 W. Va. 541, it was said: "If it be true, as alleged in the affiadvit of Lane, that the indorser Buffington always acknowledged liability for the debt sued on and promised to pay the same, and these facts had been proved on a trial, such acknowledgment and promise to pay the note was a waiver of all notice, although nothing was said about notice in the acknowledgment, for in such case the holder is not bound to prove that notice of a protest thereof was given him". See also *Devendorf* v. *Oil Company,* 17 W. Va. 175.

The decisions in the cases cited, it is true, antedate the enactment of the uniform negotiable instruments act; but that fact is immaterial, because the act, in addition to the recognition of the doctrine of waiver, does not attempt to determine all the details that tend to fix the liability of an indorser, and, in so far as applicable now, that liability remains as it was at the common law, except as modified by that act. However, whether the common law principles apply or not,

and we are satisfied they do, a Kentucky case holds that an indorser of a negotiable instrument, who after the time for giving notice of dishonor declares his intention to pay the note, waives notice of dishonor, regardless of whether he had knowledge that he had been discharged by reason of failure to receive notice of dishonor. *Doherty* v. *Bank,* 186 S. W. 937. The court in this case interpreted the section of the act regarding waiver, being section 109 of our act.

There is also the same degree of uniformity among the decisions holding unnecessary a consideration to support a waiver. *Burgettstown National Bank* v. *Nill,* 213 Pa. 456, citing numerous authorities. For additional authorities see note to this case in 5 Ann. Cas. 478. Besides, the rule seems to be general that a waiver of notice of nonpayment of a note also constitutes a waiver of presentment for payment in accordance with the implied provisions of the contract of indorsement. *Bank* v. *Nill, supra; Barclay* v. *Weager,* 19 Pa. 396; *Worley* v. *Johnson,* 60 Fla. 294; *Baumeister* v. *Kunst, supra; Pollard* v. *Bowen,* 57 Ind. 232; *Bank* v. *Mason,* 121 Ia. 570; *Pinney* v. *McGregory,* 102 Mass. 186; 8 C. J. 696.

It can not reasonably be contended that, because some of the statements emanating from the indorsers themselves or attributed to them by the plaintiff did not contain all the elements of a waiver because conditional, a waiver did not arise. Some of the statements so made were not conditional. They were positive and unequivocal, and were such as to induce the belief that when made the indorsers did not intend to escape liability by relying upon the delinquency of plaintiff to make presentment for payment and give notice of dishonor. They did not contradict the statement of plaintiff that they authorized him to sue on the note, and would pay whatever amount he failed to collect from the makers. That was a concession of their liability to that extent. The only attempted denial was the conclusion that they did nothing to waive their legal rights, and that denial came only upon the pressure by counsel after an apparent disinclination to answer the question propounded to them. "A waiver may result from implication, * * or from any words and acts which

by fair and reasonable construction are of such a character as
will satisfy the mind that a waiver was intended, although
the words are to be strictly construed''.   Where an indorser,
who knows a note on which he is liable has not been paid and
not presented for payment, by language indicates an inten-
tion to be bound by his contract notwithstanding the laches
of the holder, accompanied by a request that he try to collect of
the maker, this will operate as a waiver. *Parsons* v. *Dickinson,*
23 Mich. 56.   A further illustration of a waiver is the state-
ment, ''When I come to town I will set that matter to rights'',
made by an indorser in answer to a letter of the holder after
laches in giving notice of nonpayment of the note at maturity.
*Anson* v. *Bailey,* Buller N. P. 276.

These reasons lead to the conclusion that the judgment is
erroneous, in that it discharged Johnson and Granville Cur-
ry's estate in the hands of his executor from all liability on
the instrument, though of course no judgment could be ren-
dered against the executor jointly with Johnson and Wilkin-
son, because by death the action abated as to the testator and
thereafter could not be revived so as to proceed jointly against
all of them at the same time.   *Henning* v. *Farnsworth,* 41 W.
Va. 548.

We therefore reverse the judgment, because it attempts to
discharge the indorsers from liability, and render judgment
here jointly against D. E. Wilkinson and S. S. Johnson for
the sum of $866, the amount of the recovery allowed by the
trial court, with interest from September 11, 1915, the date
of the judgment complained of, and dismiss the action as to
Granville Curry without prejudice to another suit, with costs
to the plaintiff in error.

*Reversed, and judgment for plaintiff.*