FARMERS' & MECHANICS' NAT. BANK OF
FORT WORTH v. HEAD et al.*
(No. 6802.)

(Court of Civil Appeals of Texas. Austin.
Nov. 12, 1924. Rehearing Denied Jan.
21, 1925.)

1. Estoppel ⊜⇒52—Waiver must be distinctly
made with full knowledge of rights intended
to be waived.

Waiver must be distinctly made, with full
knowledge of rights intended to be waived.

2. Bills and notes ⊜⇒422(1)—Unconditional
promise to pay and knowledge of failure to
give indorser notice of dishonor necessary to
constitute waiver.

To constitute waiver under Negotiable In-
struments Act, § 109 (Vernon's Ann. Civ. St.
Supp. 1922, art. 6001—109), of failure to give
indorser notice of dishonor as required by sec-
tions 89, 96, 102, 103 (Vernon's Ann. Civ. St.
Supp. 1922, arts. 6001—89, 6001—96, 6001—102,
6001—103), unconditional promise to pay and
knowledge of failure to give notice must be
shown.

3. Bills and notes ⊜⇒422(1)—Failure to give
indorser notice of dishonor not waived by
conditional promise to pay.

Indorser's promise to pay note, sufficiently
secured by mortgage at time, on condition that
holder first exhaust security, which it failed
to do, was not unequivocal, and hence did not
constitute waiver of failure to give notice of
dishonor.

On Motion for Rehearing.

4. Bills and notes ⊜⇒396—Notice of dishonor
held not dispensed with because indorser was
president of corporation making note.

President of corporation executing note
indorsed by him *held* not person to whom deem-
ed presented for payment within Negotiable In-
struments Act, § 115 (Vernon's Ann. Civ. St.
Supp. 1922, art. 6001—115), so as to dispense
with requirement of notice of dishonor.

5. Bills and notes ⊜⇒510—Whether indorser
knew that no notice of dishonor was sent
him immaterial on issue of waiver.

Whether indorser, not shown to have made
absolute, unconditional promise, after matu-
rity to pay note, knew that no notice of dishonor
was ever sent him, *held* immaterial on issue of
waiver of notice.

Appeal from District Court, Tarrant Coun-
ty; Ben M. Terrell, Judge.

Action by the Farmers' & Mechanics' Na-
tional Bank of Fort Worth against J. W.
Head and others. From judgment for de-
fendant named on his cross-bill, plaintiff ap-
peals. Affirmed.

Lassiter & Harrison and R. M. Rowland,
all of Fort Worth, for appellant.

Capps, Cantey, Hanger & Short, of Fort
Worth, for appellees.

BAUGH, J. We copy from appellant's
brief the following statement of the case as
substantially correct:

"This suit was brought by Farmers' & Me-
chanics' National Bank of Fort Worth, Tex.,
in the Sixty-Seventh district court, Tarrant
county, Tex., against Union Oil Production
Company, a corporation, J. W. Head, A. H.
Kirby, and Chas. T. Ball to recover upon a
promissory note in the principal sum of $5,000,
and to foreclose a chattel mortgage given to se-
cure said note. The note was signed by Union
Oil Production Company by J. W. Head, presi-
dent, and as a part of the same transaction
J. W. Head, A. H. Kirby, and Chas. T. Ball
signed their names on the back of the note.
A jury trial was had on October 18, 1922, and
after the evidence had been closed the court
instructed a verdict in favor of the plaintiff
against Union Oil Production Company for the
amount of the note plus accrued interest and 10
per cent. attorney's fees with foreclosure of
the chattel mortgage as prayed for; and direct-
ed a verdict in favor of A. H. Kirby, Chas. T.
Ball, and J. W. Head as to plaintiff's cause of
action asserted against them; and further di-
rected a verdict in favor of the defendant J. W.
Head on his cross-bill against plaintiff, the said
Farmers' & Mechanics' National Bank, for the
sum of $14,000 plus interest, said cross-action
being based upon a certificate of deposit ex-
ecuted by said bank and held by said Head.
The jury having returned its verdict as directed
by the court, judgment was rendered on the
same day in accordance with said verdict; the
total amount of the bank's recovery against
Union Oil Production Company being $6,820.80,
and the total amount of J. W. Head's recovery
against the bank on his cross-action being the
sum of $15,547. The judgment foreclosed as
against Union Oil Production Company the
chattel mortgage held by the bank, but directed
that said judgment of foreclosure be certified
for observance and enforcement to the Seven-
teenth district court, Tarrant county, Tex., in
which the receivership of Union Oil Produc-
tion Company was pending in cause No. 51336,
styled J. E. McCamey v. Union Oil Production
Company. The judgment further provided that
plaintiff take nothing by its suit against de-
fendants J. W. Head, A. H. Kirby, and Chas.
T. Ball."

The following agreement appears in the
statement of facts:

"It is agreed that the promissory note sued
upon was in the banking house of the plaintiff
bank in Fort Worth during the entire day of
the maturity of said note, and that during all
of said day the said bank was ready and will-
ing to accept payment and receive payment of
said note; but that no offer of payment was
made during said day by the Union Oil Produc-
tion Company or any one for it. It is further
agreed that no presentment of the note to the
maker thereof for payment was made on said
day of maturity unless the facts above stated
constituted a presentment of the note for pay-
ment. It is further agreed that no notice of
presentment for payment or of the dishonor of
the note by nonpayment of same was either
mailed or delivered, or attempted to be mailed

⊜⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error granted March 24, 1925.

or delivered, on said day of maturity or on the day following, to all or any of the indorsers of the notes who were J. W. Head, A. H. Kirby, and Chas. T. Ball."

Appellant asserts only two propositions under its assignments, which are as follows:

"First Proposition. The evidence at the trial showed conclusively and as a matter of law that defendant J. W. Head waived the failure on the part of the bank to give him notice of the dishonor of the note in the manner required by the Negotiable Instruments Act; and hence the bank was entitled to a directed verdict against Head for the amount due on said note.

"Second Proposition. The evidence was at least sufficient to carry to the jury the question of waiver by J. W. Head of the statutory notice of the dishonor of said note; and hence, if the court did not see fit to direct a verdict in favor of the plaintiff bank, he should at least have submitted the issue of waiver to the jury."

There is no complaint of the judgment of the trial court as to the cross-action of Head, nor as to the appellees Kirby and Ball. It is admitted that none of the indorsers were given notice of dishonor in the manner prescribed by sections 96, 102, and 103 of the Negotiable Instruments Act, passed by the Thirty-Sixth Legislature (Acts of 1919, 36th Leg. c. 123; Vernon's Sayles' Civ. Stats. 1922 Supp. art. 6001). Section 89 of said act provides as follows:

"Except as herein otherwise provided, when a negotiable instrument has been dishonored by nonacceptance or nonpayment, notice of dishonor must be given to the drawer and to each indorser, and any drawer or indorser to whom such notice is not given is discharged."

Section 109 of said act provides that—

"Notice of dishonor may be waived, either before the time of giving notice has arrived, or after the omission to give due notice, and the waiver may be express or implied."

The sole question in this case is whether or not there was an implied waiver by Head after the omission to give notice to him of nonpayment of the note at its maturity. The evidence shows that the note sued upon matured March 12, 1920; that the maker of the Union Oil Production Company, was placed in the hands of the receiver on March 4, 1920, and plaintiff bank, appellant here, notified thereof. Though the officers of the bank testify as to different conversations with Head after the note matured, they could not fix the time, and we think the evidence showed clearly that the first conversation Head had with such officers of the bank about the note was about April 9 or 10, 1920, or approximately a month after the note fell due.

Ben H. Martin, a vice president of the appellant bank, who made the loan and took the note, testified as to his first conversation

with Dr. Head after maturity of the note, as follows:

"In substance it was that the company was in the hands of a receiver, and he insisted on the bank awaiting the outcome of that, it might be inventoried, and I told him he better take up the note, better pay the note off, as we were relying on him in the first place to pay the note. That is what I said to him, and Dr. Head then said that the company had some casing or pipe or maybe a boiler up the country, up above Wichita Falls, that he wanted to realize on, and the receiver was trying to sell that, and if we would wait and apply that on the note, if there was anything remaining that he would pay it. Dr. Head did not claim at that time that he had been discharged from his liability on the note by reason of the failure to present the note to the company for payment on the date it was due."

He also testified that he had had three, or four, or five such conversations with Dr. Head, and that he "did not in any of those conversations at any time say that he did not owe the note. He never denied liability; at all times he said he would protect the bank and pay the note."

On cross-examination this witness further testified as follows:

"Q. Now, back to the question of the discussion of the matter with Dr. Head: He told you to make what you could out of the property—I don't care whether through the receiver or by foreclosure of the mortgage—and he would pay the balance? A. Yes, sir.

"Q. That is what he said all along? A. Yes, sir. I had another conversation with him, in which conversation I insisted that he go to see George Beggs and get some action, and Dr. Head said that he didn't want to see him because he had answered him rather shortly prior to that, but he finally agreed to go see George Beggs.

"Q. And in each of these conversations, whether one or more or two or more, each time he said, 'Make what you can out of this, and I will pay the balance.' He was going to protect the bank in any deficit? A. Yes, sir. That was the agreement all along. The Doctor and I, in talking about the receivership—the idea was to let George Beggs as receiver try to sell the property, and that was the reason he was standing us off on the note, to see what the receiver could get out of it, and he would protect the bank and pay the balance, Dr. Head wanted it made out of the property as much as it could be."

J. T. Pemberton, president of the bank, testified as to his conversation with Dr. Head as follows:

"I do not know that I can give the exact words of the conversation with the Doctor, but Dr. Head didn't want us to press the note at that time, that is, the collection of it; he said that he would like to have it run on, on account of the fact of having some security that was to be sold. I couldn't give all the details of it—that was to be sold, and he expected to take care of it, and he wanted to get all he could out of this security first to protect him-

self, some mortgage security, I believe, he had on it. He said it was in the hands of the receiver or something, but the conversation was that he didn't want to be pressed at that time; didn't want to take it up; he wanted it to run on awhile. He didn't say anything about not being liable on the note. He said that he would take care of the note, or the balance of it, if it was not paid out; he committed on that."

And upon cross-examination he further testified:

"Q. As I understand you, the substance of that conversation with the Doctor was this: That he asked you not to bring suit or press the company, nor press them, because he wanted you to get what you could out of the assets of the company? A. Yes.

"Q. And he would pay the balance? A. In other words, we asked him to take the note up.

"Q. And he said that he wanted you to get what you could out of it? A. He wanted to get what he could out of the company.

"Q. Realize all you could on the mortgage, and he would pay the balance? A. He said something about he wanted to get what he could out of the company."

Elmer Renfro, cashier of said bank, testified as to conversations with Dr. Head several months after the note matured with reference to this note:

"That he didn't want to pay it until the other indorsers had paid or were ready to pay their part, or in substance that he was ready to pay his part whenever the other indorsers were ready to pay it, and on another occasion, probably about the same time, he said that he would pay the note when he had to, but he didn't want to pay it until the receiver had recovered whatever could be recovered out of the security behind that note, and then he would pay the balance, or he and the others together would pay the balance; that is the substance of the two, three, or four conversations I had with him at different times about the matter."

And upon cross-examination he testified:

"Q. He would pay his part if the others would pay, and he wanted what could be made, made out of the property? A. Yes, sir; his indorsement on the note was good for it, and he would pay it if he had to."

Mr. A. H. Kirby, who was vice president of the Union Oil Production Company, and who had executed the mortgage on its property to secure the note, testified on the issue before us as follows:

"After the note became due, I was in the Farmers' & Mechanics' Bank with Dr. Head when the matter of the note was discussed. The conversation was with Mr. Ben H. Martin. The conversation at the time was with reference to this note and mortgage, being the instruments sued on in this case. Dr. Head, in that conversation, made the statement to Mr. Martin that there was plenty of property included in that mortgage to pay the debt, and if they would foreclose that mortgage and there was any deficit, he (Dr. Head) would pay it,

and at that time—the first time we went around there was about—somewhere in the early part of April of 1920."

And again:

"Now, I was present at one other time subsequent to that; I don't remember just how long, when there was a conversation between Mr. Martin and Dr. Head, and substantially the same conversation took place. Dr. Head was insisting that the property was sufficient to pay it, and that they go ahead and foreclose and if there was any deficit he would pay it. Those are the only two conversations that I heard. I did not hear any conversation between him and any other official of the bank. The last conversation I mentioned was also with Mr. Martin; both of them were."

Dr. J. W. Head, president of said Oil Production Company, testified on this issue as follows:

"As to when it was, after that, I had any conversation with Mr. Martin of the Farmers' & Mechanics' Bank or any of the other officials of the bank, I will state that it was on the same occasion that Judge Kirby related while on the stand; it was about the 10th—9th or 10th—of April, I would judge. It was at the time that the mortgage was sent off to be recorded. That was the first time that I had any conversation with any of the officers of the bank with reference to the matter after the maturity of the note. I am asked to tell the court and jury what I said to Mr. Martin on that occasion. I told Mr. Martin that he had a mortgage there and that the mortgage was taken with the understanding that it was to protect the indorsers on that note; that I had refused to sign the note unless he would take the mortgage to protect us. and he had a mortgage on double the amount of the note, and if he would go ahead and exhaust his security there, that if there should be any deficit left, that I would be glad to take care of it. I never told any of the officers of the bank any different statement from that."

And upon cross-examination he further testified:

"At that time, Dr. Head, you knew, did you not, that you had not received any written notice from the bank of the dishonor of that note; you knew that fact, did you not? A. Yes, I didn't know but what the note had been presented to Beggs, or what they were going to do with it. I did not know whether it had been presented to Mr. Beggs on the date that it was due and payment demanded on the note or not.

"Q. But you knew that you had not received any in the mail, or in any other way, any communication from the bank notifying you that the note had been presented for payment and had not been paid? A. No, sir; I had no way of knowing it."

We have quoted the chief testimony on the issue of waiver by Dr. Head of notice to him of nonpayment of the note, as required by the sections of the Negotiable Instruments Law above referred to. The trial court held that such proof did not show a waiver, and

instructed a verdict in favor of Dr. Head, along with the other indorsers.

We think the following conclusions can fairly be deduced from this testimony: (1) That in these conversations with the officers of the bank after the maturity of the note, Dr. Head did not deny liability on it. (2) That such promises to pay as he did make were conditioned upon the other indorsers paying their part, or upon the bank's foreclosure of its mortgage and the sale of the oil company's property first, or both, and such promise to pay confined to any balance then due. From Dr. Head's testimony it appears that he did not know that no notice of dishonor had been sent him.

[1] The general rule as to waiver, as stated in 27 R. C. L. p. 909, is that—

"No man can be bound by a waiver of his rights, unless such waiver is distinctly made, with full knowledge of the rights which he intends to waive; and the fact that he knows his rights, and intends to waive them, must plainly appear."

In 40 Cyc. 259, the following is laid down:

"Knowledge of the existence of the right, benefit, or advantage on the part of the party claimed to have made the waiver is an essential prerequisite to its relinquishment."

And as applied to negotiable instruments, the following rule is laid down in 3 R. C. L. 1239:

"Where acts are relied upon to show a waiver, they must be clear and unequivocal; they must be incapable of explanation or qualification."

In 8 C. J. 710, the following appears:

"However, there is no waiver unless such promise is absolute and unconditional, is made by the party to be charged to the person entitled to demand payment, and is made with full knowledge of the promisor of the neglect to make demand and give notice."

Numerous authorities from many states, including Stone v. Smith, 30 Tex. 138, 94 Am. Dec. 299, and Bank v. Bonner (Tex. Civ. App.) 27 S. W. 698, from Texas, are cited in support thereof.

[2] We do not deem it necessary to discuss and differentiate the authorities cited by appellant. We have carefully read and considered these cases, but do not find that they change the general rules above quoted. Appellant quotes at length in its brief and relies largely upon the case of Thompson v. Curry, 79 W. Va. 771, 91 S. E. 801, a West Virginia case, in which the facts were somewhat similar to those in the instant case. In that case, however, the indorsers had recognized before maturity of the note the maker's inability to pay and had negotiated with the owner of the note and with the maker in an effort to get some security. The evidence of waiver in that case was much

stronger, we think, than in the case before us. The court in that case cites with approval, and as determinative of the particular issue of waiver, the case of Doherty v. Bank, 170 Ky. 810, 186 S. W. 937, and relies upon it to sustain its holding therein. In the Doherty Case, notice of dishonor was pleaded and the jury found that it had been given in writing, which of necessity eliminated the question of waiver. In disposing of all the issues raised, however, in passing upon a charge defining waiver, the court used the following language:

"A promise to pay, made by an indorser after the time within which notice of dishonor should have been given, is all that is necessary to constitute a waiver of notice"—citing another Kentucky case, Mechanics' & Farmers' Savings Bank v. Katterjohn, 137 Ky. 427, 125 S. W. 1071, Ann. Cas. 1912A, 439.

Clearly this was a lax expression of the rule, and does not, we think, correspond with the great weight of authority on the subject. Even in the Katterjohn Case, decided by the same court as the Doherty Case, the court quotes with approval the following language:

"Evidence of circumstances or of conversations which are equivocal in their character and which do not import a clear admission of liability, or amount to a distinct promise to pay, and which are consistent with the view that the indorser was merely seeking to avoid or postpone a suit against himself, are not satisfactory evidence either to prove actual notice or to re-establish the indorser's liability after it has ceased for want of demand or notice."

[3] But if it be admitted that the holdings in Thompson v. Curry and Doherty v. Bank, supra, sustain appellant's contention, we think they are contrary to the great weight of authority, that to constitute a waiver of a legal right, which is admitted to have accrued to Dr. Head in this case through failure by appellant to give notice of dishonor, it was necessary for appellant to show an unconditional promise to pay and knowledge by Dr. Head of its failure to give the required notice of dishonor. This the appellant failed to do. The suit was not filed until some 10 months after the note matured. Meantime a considerable portion of the oil company's property on which the bank held the mortgage was lost or stolen. It was Dr. Head's contention that when he had his conversations with the bank's officers the mortgage security was sufficient to pay the note if sold then, and his promise to pay was conditional upon the bank's prompt action in exhausting its security and confined to any balance remaining. This condition was not complied with by the bank, hence the promise was not unequivocal, and did not constitute a waiver on his part. Nor do we think the evidence was sufficient to go to the jury on the issue.

Finding no error in the action of the trial court, its judgment is affirmed.

Affirmed.

### On Motion for Rehearing.

[4] Appellant pleaded its case, tried it below, assigned error, and briefed it on the theory that J. W. Head had, after the maturity of the note, waived the notice of presentment and nonpayment required by the Uniform Negotiable Instruments Act. In its motion for a new trial appellant now attacks the action of the trial court for the first time on an entirely different ground. It now contends that since Head was president of the corporation which made the note, was familiar with its affairs, knew that it was insolvent when the note matured, and was the proper person to whom presentment for payment should have been made at maturity, since the note was in the bank where payable on the day of maturity, which fact, in legal contemplation, amounted to presentment to the corporation for payment, the result is the same as if the note had been presented to him as such president in person on the day it matured, and brings the case within section 115 of the Negotiable Instruments Act, which dispenses with the requirement that notice of dishonor be given "where the indorser is the person to whom the instrument is presented for payment." Appellant cites several authorities not heretofore called to our attention in support of its new contention.

We have read carefully all the authorities cited. In the cases of Bessenger v. Wenzel, 161 Mich. 61, 125 N. W. 750, 27 L. R. A. (N. S.) 516, In re Swift (D. C.) 106 F. 65, O'Bannon Co. v. Curran, 129 App. Div. 90, 113 N. Y. S. 359, and Mercer v. Hydrocarbon Converter Co., 205 App. Div. 78, 199 N. Y. S. 75, it was held in each instance that some conduct representations, or agreements of the indorser before the date of maturity of the note sued upon amounted to an implied waiver of notice of dishonor, or rendered such notice unnecessary. No such state of facts exists in the present case. It is not contended that J. W. Head did anything prior to maturity that could be construed as a waiver and appellant's only contention on this issue was that his waiver of notice occurred after maturity of the note. Do the facts of the instant case then bring it within section 115 of our Negotiable Instruments Act (Vernon's Sayles' Civil Statutes 1922 Supp. art. 6001—115) so as to make notice of dishonor unnecessary. We think not. In Westinghouse Electric & Mfg. Co. v. Hodge, 181 Mo. App. 232, 167 S. W. 1186, Whitney v. Chadsey, 216 Mich. 604, 185 N. W. 826, Waterproof Paper & Board Co. v. Van Buren, 182 Wis. 640, 197 N. W. 338, and also in In re Swift (D. C.) 106 F. 65, it was held that the president of a corporation who indorsed the corporation's note was deemed to have been the person to whom presentment for payment was made. This rule appears to have been predicated upon the facts that in those cases he was the only proper person to whom presentment for payment could have been made, or the only person authorized to pay such note upon presentment, or that he was in active charge of the corporation's affairs and knew that the corporation had nothing with which to pay such note when it matured and could and would not pay same. In such a case notice to the indorser of what he already knew would be a vain and useless thing.

We do not disagree with the holdings in those cases, but the facts in the instant case do not bring it within the rule there announced. J. W. Head was not the only officer of the corporation, if he was in fact a proper officer—which is doubtful—to whom said note could have been presented. Certainly he was not actively in charge of the corporation's affairs. He did not even know that he had been elected on its board of directors and had never attended a board meeting. A. H. Kirby, its vice president, had been, up to a short time before the note was executed, in active charge of the corporation's business. Dr. Head testified that the only thing he ever did as president was to sign the note sued upon. Mr. Kirby as vice president executed the mortgage at that time on the corporation's property to secure the note. This mortgage was executed for the express purpose of protecting the indorsers, and Dr. Head testified that when the note matured the mortgaged property securing its payment was worth more than the amount of the note. A Mr. Barber was treasurer of the corporation. Mr. Kirby would have been as proper a party to whom presentment for payment could have been made as was Dr. Head. Then, too, the corporation had been placed in the hands of a receiver some eight days before the note matured. Its assets had doubtless all been turned over to him, including money on hand. Dr. Head could not have paid said note, under such circumstances, if it had been presented to him and the corporation had had sufficient funds on hand to pay this particular debt; but the bank would have been required to present its claim to the receiver, have same allowed, and paid under order of the court. Nor was Dr. Head's indorsement the only security the bank had. According to his testimony, the bank had ample security on property belonging to the corporation, which property had doubtless been turned over to the receiver, from which the entire debt could have been paid at that time. Under such circumstances, we think it cannot be said that Dr. Head knew, at the time of maturity of the note, that the corporation could not and would not pay such note on presentation to the proper party, or that the bank must look to him as indorser for payment. The facts of

this case, therefore, are not analogous to those in the cases cited, and it does not come within the rule there announced.

[5] Appellant also complains of this court's giving weight to the testimony of Dr. Head that he did not know whether any notice of nonpayment had been sent to him. Appellant's fifth assignment of error, however, complains of the failure of the trial court to submit this very issue to the jury. Our conclusion was not based on this question, however, but on the failure of the evidence to show an absolute and unconditional promise of Dr. Head, made after maturity, to pay the note, which was essential to constitute waiver. It was agreed that no notice of dishonor was ever sent him, and it was immaterial whether he knew such fact or not.

Appellant's motion is therefore overruled. Overruled.