## FARMERS' & MECHANICS' NAT. BANK OF FORT WORTH v. HEAD et al.
(No. 875–4355.)

Commission of Appeals of Texas, Section B.
May 30, 1928.

1. **Bills and notes** ⟨key⟩537(7)—**Conduct of indorser indicating waiver makes waiver question of fact, and intention to waive notice of dishonor, expressed or clearly implied, makes question of law (Negotiable Instruments Act, § 109 [Vernon's Ann. Civ. St. 1925, art. 5938]).**

Under Negotiable Instruments Act, § 109 (Vernon's Ann. Civ. St. 1925, art. 5938), providing that notice of dishonor may be waived and that waiver may be express or implied, waiver is question for jury if indorser's conduct or act tends to show waiver, and if intention is expressed or clearly implied waiver is question of law for the court.

2. **Contracts** ⟨key⟩168—**Matter implied in contract is as much part of it as express provisions.**

What is implied in a contract is as much a part of it as that which is expressed.

3. **Bills and notes** ⟜422(1)—**Indorser's waiver of notice of dishonor is shown by words or conduct constituting recognition of continued liability and intent to be bound, without unconditional promise to pay (Negotiable Instruments Act, § 109 [Vernon's Ann. Civ. St. 1925, art. 5938]).**

To constitute waiver by indorser of failure to give notice of nonpayment and dishonor, under Negotiable Instruments Act, § 109 (Vernon's Ann. Civ. St. 1925, art. 5938), unconditional promise to pay is not indispensable, but waiver may be shown by acts or conduct constituting recognition of continued liability or showing intention to waive notice, or by use of words showing intention to pay; intention of the indorser being the true test of waiver.

4. **Bills and notes** ⟜422(1)—**Indorser's waiver of notice of dishonor is not dependent upon conduct of holder or upon new promise to pay (Negotiable Instruments Act, § 109 [Vernon's Ann. Civ. St. 1925, art. 5938]).**

Indorser's waiver of notice of dishonor, under Negotiable Instruments Act, § 109 (Vernon's Ann. Civ. St. 1925, art. 5938), does not depend upon any act or conduct of opposite party, but is independent of principle of estoppel and independent of whether or not there has been a new promise which, of itself, would support an action.

5. **Bills and notes** ⟜422(1)—**Indorser who, knowing of holder's failure to give notice of dishonor, promised to pay deficit after security was exhausted, as matter of law, waived notice (Negotiable Instruments Act, § 109 [Vernon's Ann. Civ. St. 1925, art. 5938]).**

Indorser who knew that he had not received notice of dishonor and nonpayment of note and nevertheless agreed to make payment of deficit, provided the holder would go ahead and exhaust the corporate maker's security, as matter of law, waived notice, under Negotiable Instruments Act, § 109 (Vernon's Ann. Civ. St. 1925, art. 5938).

Error to Court of Civil Appeals of Third Supreme Judicial District.

Action by the Farmers' & Mechanics' National Bank of Fort Worth against J. W. Head and others. Judgment for defendant named was affirmed by the Court of Civil Appeals (268 S. W. 992), and plaintiff brings error. Reversed and rendered.

L. H. McCrea, of Roby, Stinson, Coombes & Brooks, of Abilene, Charles E. Coombes, of Stamford, and Bean & Klett, of Lubbock, for plaintiff in error.

Vickers & Campbell and G. E. Lockhart, all of Lubbock, for defendants in error.

SPEER, J. The writ of error herein presents the question of whether or not defendant in error Head has been discharged as indorser upon a promissory note of $5,000, payable to the plaintiff in error, which in turn depends upon whether or not the failure of the bank to give the indorser notice of the dishonor and nonpayment of the note by the maker has been waived. The trial court instructed a verdict for the defendant Head, and the Court of Civil Appeals affirmed that judgment (268 S. W. 992).

The plaintiff in error presents the matter to us, as it did in the Court of Civil Appeals, upon these propositions:

"(1) The evidence at the trial showed conclusively and as a matter of law that defendant J. W. Head waived the failure on the part of the bank to give him notice of the dishonor of the note in the manner required by the Negotiable Instruments Act; and hence the bank was entitled to a directed verdict against Head for the amount due on said note.

"(2) The evidence was at least sufficient to carry to the jury the question of waiver by J. W. Head of the statutory notice of the dishonor of said note; and hence, if the court did not see fit to direct a verdict in favor of the plaintiff bank, he should at least have submitted the issue of waiver to the jury."

As said by the Court of Civil Appeals, the sole question in this case is whether or not there was an implied waiver by Head, after the omission to give notice to him of nonpayment of the note at its maturity; or, at least, a determination of this question in the affirmative will be decisive of the case. Without deciding whether, under the facts of this case, notice was in any event required to be given to defendant in error, we proceed to determine whether or not he has waived the failure to give such notice.

The Court of Civil Appeals reviewed the testimony and held that it was necessary for the bank to show an unconditional promise to pay and knowledge by Dr. Head of its failure to give the required notice of dishonor, which, it held, the bank failed to do.

Section 109 of our Negotiable Instruments Act ([Vernon's Ann. Civ. St. 1925] art. 5938) provides:

"Notice of dishonor may be waived, either before the time of giving notice has arrived, or after the omission to give due notice, and the waiver may be express or implied."

[1, 2] Viewed, as it should be, as a question of waiver as contradistinguished from estoppel or new promise, there is nothing in the statute to support the contention or holding that a waiver can only be shown by an "unconditional promise to pay," or, indeed, that the acts relied upon "must be clear and unequivocal." The language of the statute is that such waiver "may be express or implied." So that, if the conduct or act relied upon tends to show a waiver, a question of fact for the jury arises, and if the intention is expressed or clearly implied it becomes a question of law for the court, for what is implied in a contract is as much a part of it as that which is expressed. The text in 8 C. J. 710,

is cited for the holding of the Court of Civil Appeals, wherein it is said:

"However, there is no waiver unless such promise is absolute and unconditional, is made by the party to be charged to the person entitled to demand payment, and is made with full knowledge of the promisor of the neglect to make demand and give notice."

Such conclusion, thus broadly stated, is plainly contrary to the express provision of the Negotiable Instruments Act, and further is inconsistent with the theory of waiver.

[3] The authorities abundantly show that an indorser may waive the failure to give notice of nonpayment in a variety of ways short of an unconditional promise to pay. Thus, a request for forbearance (Gove v. Vining, 7 Metc. [Mass.] 212, 39 Am. Dec. 770), a partial payment after maturity (Perry v. Rhodes, 19 Fed. Case 295, No. 11011; Curtiss v. Martin, 20 Ill. 557; Lane v. Steward, 20 Me. 98) may constitute a waiver. And, of course, an express waiver thus, "I waive the failure to give notice of presentment and dishonor," merely implies a promise to pay. Indeed, an unconditional promise to pay makes a new contract, whereas the waiver of a ground of discharge does not. The two things are different in their form and essence. The true test is the intention of the indorser. Whatever the act or conduct relied upon as a waiver, if it constitutes a clear recognition of a continued liability (First National Bank of Hastings v. Bonner [Tex. Civ. App.] 27 S. W. 698) or reasonably is such as to induce the conclusion that such waiver was intended (Linthicum v. Bagby, 131 Md. 644, 102 A. 997), or to evidence a willingness of the indorser to be bound by the contract notwithstanding the laches of the holder (Thompson v. Curry, 79 W. Va. 771, 91 S. E. 801), or the use of words showing a clear intention to pay (Doherty v. First Nat. Bank of Louisville, 170 Ky. 810, 186 S. W. 937), it will constitute a waiver. See Roberts v. Bank of Parrott, 30 Ga. App. 724, 119 S. E. 220; Kuhl v. Schlictemeier (C. C. A.) 14 F. (2d) 593; Morgan v. Huffmann, 76 Mont. 396, 247 P. 326; Fashion Hat Frame Co. v. Ringel (Cal. App.) 254 P. 275.

[4] A waiver, as such, must be distinguished from ordinary estoppel in pais, for it is not essential to the former that the opposite party do anything whatever upon the strength of the statement or act relied upon as constituting a waiver. It is like the legal concept of election of remedies. The indorser upon the failure to receive notice is given the choice to be discharged from liability or to continue to recognize liability and be bound upon the instrument, and, having made the choice of the latter, there is a waiver independent of any principle of estoppel and independent of whether or not there has been a new promise which, of itself, would support an action.

[5] Now, with these principles in mind, we will examine the testimony. Ben H. Martin, a vice president of the plaintiff in error, who made the loan and took the note, testified as to his first conversation with Dr. Head after maturity of the note, as follows:

"In substance, it was that the company was in the hands of a receiver, and he insisted on the bank waiting the outcome of that, it might be inventoried, and I told him he better take up the note, better pay the note off, as we were relying on him in the first place to pay the note. That is what I said to him, and Dr. Head then said that the company had some casing or pipe or maybe a boiler up the country, up above Wichita Falls, that he wanted to realize on, and the receiver was trying to sell that, and if we would wait and apply that on the note, if there was anything remaining that he would pay it. Dr. Head did not claim at that time that he had been discharged from his liability on the note by reason of the failure to present the note to the company for payment on the date it was due."

On cross-examination, he further testified:

"Q. Now, back to the question of the discussion of the matter with Dr. Head: He told you to make what you could out of the property—I don't care whether through the receiver or by foreclosure of the mortgage—and he would pay the balance? A. Yes, sir.

"Q. That is what he said all along? A. Yes, sir. I had another conversation with him, in which conversation I insisted that he go to see George Beggs and get some action, and Dr. Head said that he didn't want to see him because he had answered him rather shortly prior to that, but he finally agreed to go see George Beggs.

"Q. And in each of these conversations, whether one or more or two or more, each time he said, 'Make what you can out of this, and I will pay the balance.' He was going to protect the bank in any deficit? A. Yes, sir. That was the agreement all along. The doctor and I, in talking about the receivership—the idea was to let George Beggs as receiver try to sell the property, and that was the reason he was standing us off on the note, to see what the receiver could get out of it, and he would protect the bank and pay the balance. Dr. Head wanted it made out of the property as much as it could be."

J. T. Pemberton, president of the bank, testified as to his conversation with Dr. Head:

"I do not know that I can give the exact words of the conversation with the doctor, but Dr. Head didn't want us to press the note at that time, that is, the collection of it; he said that he would like to have it run on, on account of the fact of having some security that was to be sold. I couldn't give all the details of it—that was to be sold, and he expected to take care of it, and he wanted to get all he could out of this security first to protect himself, some mortgage security, I believe, he had on it. He said it was in the hands of the receiver or something, but the conversation was that he didn't want to be pressed at that time, didn't want to take it up; he wanted it to run on awhile. He didn't say anything about not being liable on

the note. He said that he would take care of the note, or the balance of it, if it was not paid out; he committed on that. He didn't want to be pressed until this could be secured, that is, that was the reason for wanting it carried on, in order to collect some security."

Elmer Renfro, cashier of plaintiff in error, upon cross-examination, testified:

"Q. He would pay his part if the others would pay, and he wanted what could be made, made out of the property? A. Yes, sir; his indorsement on the note was good for it, and he would pay it if he had to."

And, further:

"As well as I can remember, it must have been in May or June or July of 1920, somewhere along there in that period, that I talked to Dr. Head about paying the note, and I think my particular conversation or the first conversation with him about it was when he asked for the certificate of deposit which we held for some $14,000, or approximately that amount, to be delivered to him, and I declined to deliver it and told him that we were not going to deliver it to him until the note was paid, and Dr. Head said that was unnecessary, that his indorsement on the note was perfectly good for the note, and it could be made out of him; that he didn't want to pay it until the other indorsers had paid or were ready to pay their part, or, in substance, that he was ready to pay his part whenever the other indorsers were ready to pay it, and on another occasion, probably about the same time, he said that he would pay the note when he had to, but he didn't want to pay it until the receiver had recovered whatever could be recovered out of the security behind that note, and then he would pay the balance, or he and the others together would pay the balance; that is the substance of the two, three, or four conversations I had with him at different times about the matter. At no time did he ever deny to me his liability on the note."

Mr. A. H. Kirby, at one time president of the company issuing the note, testified:

"After the note became due, I was in the Farmers' & Mechanics' Bank with Dr. Head when the matter of the note was discussed. The conversation was with Mr. Ben H. Martin. The conversation at the time was with reference to this note and mortgage, being the instruments sued on in this case. Dr. Head, in that conversation, made the statement to Mr. Martin that there was plenty of property included in that mortgage to pay the debt, and if they would foreclose that mortgage and there was any deficit, he [Dr. Head] would pay it, and at that time—the first time he went around there was about—somewhere in the early part of April of 1920."

And again:

"Now, I was present at one other time subsequent to that, I don't remember just how long, when there was a conversation between Mr. Martin and Dr. Head, and substantially the same conversation took place. Dr. Head was insisting that the property was sufficient to pay it, and that they go ahead and foreclose, and if there was any deficit he would pay it. Those are the only two conversations that I heard. I did not hear any conversation between him and any other official of the bank. The last conversation I mentioned was also with Mr. Martin; both of them were."

The defendant in error testified:

"As to when it was, after that, I had any conversation with Mr. Martin of the Farmers' & Mechanics' Bank or any of the other officials of the bank, I will state that it was on the same occasion that Judge Kirby related while on the stand; it was about the 10th—9th or 10th—of April, I would judge. It was at the time that the mortgage was sent off to be recorded. That was the first time that I had any conversation with any of the officers of the bank with reference to the matter after the maturity of the note. I am asked to tell the court and jury what I said to Mr. Martin on that occasion. I told Mr. Martin that he had a mortgage there, and that the mortgage was taken with the understanding that it was to protect the indorsers on that note; that I had refused to sign the note unless he would take the mortgage to protect us, and he had a mortgage on double the amount of the note, and if he would go ahead and exhaust his security there, that if there should be any deficit left, that I would be glad to take care of it. I never told any of the officers of the bank any different statement from that."

And, upon cross-examination, he further testified:

"At that time, Dr. Head, you knew, did you not, that you had not received any written notice from the bank of the dishonor of that note; you knew that fact, did you not? A. Yes; I didn't know but what the note had been presented to Beggs, or what they were going to do with it. I did not know whether it had been presented to Mr. Beggs on the date that it was due and payment demanded on the note or not.

"Q. But you knew that you had not received any in the mail or in any other way, any communication from the bank notifying you that the note had been presented for payment and had not been paid? A. No, sir; I had no way of knowing it."

From this testimony we think the fact of waiver is indisputably established. It is undisputed that no notice of dishonor and nonpayment was sent to Dr. Head. It is inconceivable that he was ignorant of this fact, and there is therefore no question but what he at all times knew that he had not received such notice, and his ambiguous answer to the question last above quoted constitutes no evidence of denial of such fact. We think the trial court erred in refusing the bank's summary instruction for judgment against the defendant in error, and for this reason recommend that the judgments of both courts below be reversed and judgment be here rendered in favor of plaintiff in error against defendant in error J. W. Head for the amount recovered against the maker of the note in controversy.

CURETON, C. J. Judgments of the district court and Court of Civil Appeals both reversed, and judgment rendered for the plaintiff in error, as recommended by the Commission of Appeals.