MRS. ELLA ANDERSON v. W. T. LADD ET AL.

No. 7074.   Decided April 20, 1938.
Rehearing overruled May 18, 1938.
(115 S. W., 2d Series, 608.)

480

*Dan Moody, J. B. Robertson,* and *Thomas B. Greenwood,* all of Austin, and *Perkins & Culbertson,* all of Fort Worth, for plaintiff in error.

When plaintiff in error (Mrs. Anderson) became the owner of the antecedent debt due by the furniture company, evidenced by the original note, whether by gift or purchase, it was a consideration to support a contract, and when the renewals were given and accepted upon condition that the notes be indorsed by Ladd et al., with or without their knowledge of such requirement, they became indorsers for value regardless of their previous liability. McNeill v. Simpson, 39 S. W. (2d) 835; Armstrong, Cator & Co. v. Snyder, 15 Texas Civ. App. 394, 39 S. W. 379; Harfst v. State Bank, 119 S. W. 694.

*Robt. M. Rowland* and *Leroy A. & Van Zandt Smith,* all of Fort Worth, for defendants in error.

There was no consideration for the renewals in question, because the moneys advanced by Turner were not to be repaid until all other debts of the furniture company had been met, and the evidence showed that the furniture company was insolvent at the time of the execution of the note, and the note being a gift to Mrs. Anderson, from her brother, she took it subject to all defenses available against her donor. Brannon Neg. Inst., p. 318, sec. 24; Massie v. Hutcheson, 270 S. W. 544.

MR. PRESIDING JUDGE HARVEY delivered the opinion of the Commission of Appeals, Section A.

This suit was originally instituted in a district court of Tarrant County, on March 27, 1933, by W. T. Ladd, B. H. Martin, Dr. J. W. Irion and Mrs. George E. Cowden, and by W. T. Ladd and B. H. Martin as independent executors of the estate of W. G. Turner, deceased, against Mrs. Ella Anderson, a widow, for the cancellation of the unqualified indorsements of Ladd, Martin, Irion, Mrs. Cowden and W. G. Turner which are borne by four promissory notes of the Hub Furniture Company, payable to Mrs. Anderson and which she held. The plaintiffs, in their petition, sought and obtained a temporary injunction restraining Mrs. Anderson from negotiating the notes pending the suit. The Hub Furniture Company was by the plaintiffs' petition made a party defendant in the suit. The grounds for cancellation alleged by the plaintiffs will be more fully shown in discussing the several contentions of the plaintiffs, who are the defendants in error here. A few days later, Mrs. Anderson answered in the suit, and by cross action sought recovery on all four notes as against the Hub Company and all the indorsers, including W. T. Ladd and B. H. Martin as independent executors of the estate of W. G. Turner, deceased—Turner having died in January, 1933. The four notes were for $5000 each, and will be fully described later. A trial before a jury on special issues resulted in a judgment for Mrs. Anderson against the Hub Company and Ladd and Martin, individually and as executors of the estate of W. G. Turner, deceased, for the amount of all four notes, and against Irion and Mrs. Cowden on three of the notes. All the indorsers appealed, and the Court of Civil Appeals reversed the judgment of the trial court in so far as same was against any of the indorsers, and rendered judgment in their favor. 89 S. W. (2d) 1041.

The controversy here is between Mrs. Anderson, the plaintiff in error, and the indorsers, Ladd, Martin, Irion, Mrs. Cowden, and the estate of W. G. Turner. The controversy goes to the validity of the four notes, as promissory notes payable according to their terms, and to the liability of the indorsers. The defendants in error contend that they never became liable as indorsers, first, because the notes were never delivered for the purpose of putting them into effect according to their terms; secondly, the notes are not supported by a valuable consideration; thirdly, the indorsers are accommodation indorsers. The substance of the testimony upon which these several contentions are founded is to the following effect:

In November, 1928, the Hub Company was in debt to the extent of approximately $300,000 and was unable to pay its

debts in regular course. Some of the debts were pressing for payment. Turner had organized the Company some years before and was a stockholder and member of the board of directors. Ladd, Martin, Irion and Mrs. Cowden were also stockholders and directors. At the time mentioned, Turner orally agreed with the board of directors to loan the Company sufficient money with which to pay its debts which were pressing for payment, and agreed that the loan was not to be repaid until the Company paid all its other debts and became able to pay the loan from profits earned. In pursuance of this oral agreement, Turner, during the next few weeks loaned the Company the aggregate sum of $90,000, all of which went to pay off debts of the Company. According to the oral agreement, the loan was to bear interest at the rate of six per cent. per annum from date of the loan until same was repaid—the interest was to be paid monthly as same accrued. At the time of the oral agreement and at the time Turner advanced the money, the parties did not contemplate that any note or notes should be executed for the loan. Sometime in the latter part of April, 1929, Turner requested Ladd, who was general manager of the Company, and chairman of the board of directors, to make out and give him the Company's notes to represent the loan which had been made in pursuance of said oral agreement. Complying with this request, Ladd, acting for the Company, made out and signed three notes for the Company—one for $50,000 and the other two for $20,000 each. One of the notes for $20,000 is the only one which has special relevancy to this controversy. The other two will not be further noticed. This last mentioned $20,000 note bore date May 1, 1929, purported to be payable January 1, 1931, and purported to bear interest at the rate of six per cent. per annum, payable monthly. Mrs. Anderson, who was Turner's sister, was named as payee in this note. This was done at Turner's request. Turner gave this note to her about the date same purports to have been executed. He indorsed same in blank. It was understood between Ladd and Turner, at the time the three notes were drawn up, signed and put into the hands of Turner, that same were not to become effective according to their terms, but were merely memoranda of the prior oral agreement between Turner and the Company. Some seven or eight months after Turner had given the $20,000 note to Mrs. Anderson, he requested Ladd, Martin, Irion and Mrs. Cowden to indorse the note. A meeting of the board of directors had just adjourned, when Turner produced the note and asked the four last named persons to indorse it as a personal favor to him, saying further: "I want you all to feel that I am asking you to do this for me

and that it doesn't mean anything to you, and if there is any liability I am assuming any liability that may be incurred—I just want my sister to feel more comfortable with the situation." Ladd, Martin, Irion and Mrs. Cowden each indorsed the note in reliance on these statements of Turner. The Hub Company regularly met all monthly payments of interest up to the time renewal notes were given as hereinafter stated. About September 1, 1931, the Hub Company, through its president, W. T. Ladd (who had in the meantime become its president and was also general manager), executed to Mrs. Anderson four renewal notes for the principal sum of $5000 each, due respectively September 1, 1932, 1933, 1934 and 1935, bearing interest from date until paid at the rate of six per cent. per annum, payable monthly. Each note provided that if any one of them was not paid at maturity, the others, at the election of the holder, would become mature. All four notes were indorsed by Turner, Ladd, Martin, Irion and Mrs. Cowden. The circumstances immediately attending the signing and indorsing of these several notes are disclosed by the testimony of Ladd, which is to the following effect: Turner called Ladd into his office and said that the note for $20,000, held by Mrs. Anderson, was running past due, and that he, Ladd, had better split the amount into four parts of $5000 each, and make four renewal notes payable September 1, 1932, September 1, 1933, September 1, 1934, and 1935, respectively. Turner said that this would give the Company "more time to get in shape to take them up." Ladd drew up the notes and, as president, signed them for the Hub Company. He indorsed them in reliance on statements by Turner, made at the time, that the indorsement of the notes would mean nothing,—would create no liability—and that if "there is any liability whatever" he, Turner, would assume same. Turner indorsed the four notes, and requested Ladd to take them to each of the other indorsers (Martin, Irion and Mrs. Cowden) and ask them to indorse the renewal notes, and repeat to each of them, for Turner, the same statements which the latter had made to Ladd. Ladd did this, and Martin, Irion and Mrs. Cowden each indorsed the renewal notes in reliance on said statements of Turner. The notes were then delivered to Mrs. Anderson who surrendered the old note for $20,000.

1 It is contended that the delivery of the renewal notes to Mrs. Anderson was not an effectual delivery, but was a delivery "for a special purpose only" as contemplated by Section 16, Article 5932, of the Negotiable Instruments Law. The pertinent provisions of this statute read as follows:

"Every contract on a negotiable instrument is incomplete and revocable until delivery of the instrument for the purpose of giving effect thereto. As between the immediate parties * * * the delivery, in order to be effectual, must be made either by or under the authority of the party making, drawing, accepting or indorsing, as the case may be; and in such case the delivery may be shown to be conditional or for a special purpose only, and not for the purpose of transferring the property in the instrument."

Regardless of what character of evidence is legally competent to show that a promissory note which has been delivered to the payee is merely a token of some prior or contemporaneous oral agreement between the parties, the statute undoubtedly regards the delivery as having been made for the purpose of giving effect to the instrument according to its terms, unless it be shown that by agreement of the parties, including the payee, the delivery was made for some other purpose. In the present case, there is no fact foundation upon which to base a conclusion that Mrs. Anderson agreed that the delivery of the four notes in question was not to be an effectual delivery or that the notes were not to be what they purported to be. As the record stands before us, and giving effect to all permissible presumptions in support of the judgment of the trial court, Mrs. Anderson appears to have had no knowledge, either actual or imputed, of the transaction between the maker and indorsers of the notes concerning the effect of the four notes and the indorsements thereon. For that matter, the jury found that without the renewal notes being indorsed by Turner, Ladd, Martin, Irion and Mrs. Cowden, Mrs. Anderson would not have accepted the notes. Furthermore, the jury found that Mrs. Anderson believed that the old note for $20,000, which she surrendered, was a valid promissory note and that all the indorsers thereof were bound. The contention that said four renewal notes were not delivered for the purpose of giving them effect according to their terms is overruled.

2  Next we shall consider the contention that the four notes were not supported by a valuable consideration. In Section 25, Article 5933, it is provided: "Value is any consideration sufficient to support a simple contract * * *." Granting that the old note for $20,000 which Mrs. Anderson held was not in fact a promissory note as it purported to be, but merely was a memorandum relating to the oral agreement under which Turner had made loans to the Company, which were not to be repaid until the Hub Company had paid all its other debts, still the

fact remains that Mrs. Anderson was the owner of the claim represented by such memorandum. Regardless of the fact that the claim, on account of the payment thereof depending upon a future contingency, did not constitute a "debt" according to the technical meaning of that term, the claim was valid and Mrs. Anderson had the contract right to demand payment of the amount of the claim whenever the contingency occurred upon which payment depended. She also had the contract right to demand payment of monthly interest on the claim until it was paid. The Hub Company, as a matter of right, could not have compelled her against her will, to accept payment of the claim before it fell due, and thus escape from its obligation, of indefinite duration, to pay monthly interest. This obligation was surrendered by Mrs. Anderson when she accepted the renewal notes which were to mature at definite times. The general rule in this State and elsewhere, with regard to simple contracts, is to the effect that the surrender by the promisee of a valid contract right, which he is not otherwise bound to surrender, constitutes a valuable consideration for the promise of the promisor. 10 Tex. Jur., pp. 123, 132; 6 R. C. L., p. 658. The contention that the renewal notes were not supported by a valuable consideration is overruled.

3 With respect to the contention that the indorsers of the four renewal notes were merely accommodation parties but little need be said. In Section 191, Article 5948, of the Negotiable Instruments Law, it is provided that the term "holder" means the *payee* or indorsee of a note, who is in possession of it, or the bearer thereof; and that the term "value" means valuable consideration. In Section 29, Article 5933, it is provided that an accommodation party "is liable on the instrument to a holder for value, notwithstanding such holder, at the time of taking the instrument, knew him to be only an accommodation party." We have already shown that Mrs. Anderson became the holder for value of the four renewal notes. The indorsers became bound regardless of whether they received value for their indorsements or not. Bonner Oil Co. v. Gaines, 108 Texas 232, 191 S. W. 552. See also Robertson v. City Natl. Bank, 120 Texas 226, 36 S. W. (2d) 481.

The renewal note which matured September 1, 1932, was not paid when it fell due and the Hub Company gave a new renewal note therefor which bears the same indorsements as the other. The terms of this new note are the same as the other, except that it was made payable March 1, 1933. This note together with the other three which were executed September 1, 1931, constitute the basis for the judgment which the trial court

rendered in favor of Mrs. Anderson. On this particular note, the trial court rendered judgment against the Hub Company and Ladd, Martin and the Turner Estate. This note was not paid on March 1, 1933, and still remains unpaid. Ladd and Martin, individually, and as executors of the Turner Estate, contend that they were discharged from the indorsement contract because the note was not presented to the Hub Company for payment on March 1, 1933—the date it fell due,—and notice of dishonor given as the statutes require. Mrs. Anderson pleaded waiver in these respects. The controversy goes to the subject of waiver. It is contended by the said indorsers, in effect, that the evidence does not show that presentment for payment and notice of dishonor were waived before the note became past due, and therefore no liability on the part of said indorsers to pay the note appears. The undisputed facts bearing on the subject of waiver are substantially as follows:

On February 20, 1933, Ladd wrote the following letter to Mrs. Anderson who was temporarily in Nashville, Tennessee:

"Mrs. Ella Anderson,
109 Louise Avenue,
Nashville, Tenn.
Dear Mrs. Anderson:

"I have been sick for the past several weeks or I would have written you sooner.

"Was very sorry that you could not come down, but I feel quite sure your physical condition would not permit same.

"Mrs. Turner has been very sick for the past two weeks herself. She asked her sister that was living in California to come and live with her. She has now arrived and the last day or so Mrs. Turner has shown some improvement.

"I rather wished that you could have come. I would have liked very much to discuss some matters with you. As you and I both know the estate was considerably tied up and it has given me quite some worry recently as to the final outcome of same.

"I have tried for the past two years and especially for the past several months, to conserve the estate that there would be something left to take care of Mrs. Turner.

"Conditions of course, have been more than unsatisfactory and it is still going to need very careful management to work out.

"As regarding the note that you have that is due on March 1st, I wish you would advise your folks to advance same about May 1st. I feel quite sure that I can arrange at least to pay

part of same by that date and perhaps monthly payments until same is fully retired.

"As stated above, I must make the best of the situation here in order to conserve at least a part of the estate, hoping that in the near future we can make some diposition of the factory either in a sale or reorganization of same so that we can release at least part of the estate.

"As you are aware, Mr. Turner had practically tied up the whole of his estate several years ago, and especially did he do so when the bank demanded that its security be better protected. As you and I have often discussed, it was a very foolish thing to have done, yet same has been done and we will have to make the best of it.

"Trusting your health is improving and perhaps you may be able to pay a visit to Mrs. Turner soon.

"With kindest personal regards, I remain
                    Sincerely,
                              W. T. LADD."

In using the term "the estate" in the above letter, Ladd meant the Turner Estate, and by the term "your folks," he meant the First National Bank of Fort Worth which held all four renewal notes for collection and to whose custody Mrs. Anderson had committed the notes several months before. The bank had been collecting the monthly interest as it accrued. The "factory" mentioned in the letter meant the factory belonging to the Hub Company. In addition to $4700 common stock, $50,000 of preferred stock of the Hub Company belonged to the Turner Estate. This preferred stock had been issued to Turner in the year 1930 in lieu of the Company's note for that amount which arose from the transaction between Turner and Ladd in April, 1929. The other $20,000 note which was given in the same transaction, had been donated to the Company a short time after that transaction. When Ladd wrote said letter, the Hub Company was, and had been since November, 1928, insolvent in the sense that it was heavily in debt and was unable to pay its debts in regular course. Ladd was the president and general manager of the Company and Martin was the vice president. Both were stockholders and members of the board of directors. Both had knowledge of the state of affairs related above. On February 23, 1933, J. B. Hamilton, an officer of the First National Bank of Fort Worth, wrote a letter to the Hub Company, and one to each of the indorsers of the note now under consideration, calling attention to the fact that the note would fall due March 1, 1933. Between the date of these letters, February 23, 1933, and March 8, 1933, Ladd and Martin had two

conversations with Hamilton regarding the note. The last of these conversations occurred March 7, 1933, when Ladd and Martin together went to the bank to see Hamilton about the note. Ladd and Martin, respectively, had before that date talked to Hamilton about extending the time for payment of the note. Hamilton, whose testimony respecting all these conversations is not disputed, was unable to remember the precise date that the first conversation with Martin and that with Ladd occurred. The date of these first conversations is not more definitely shown by Hamilton's testimony than that they occurred 'between February 23 and March 7, 1933, and that the one with Martin occurred before the one with Ladd. In the first conversation, Martin told Hamilton that the Hub Company was unable to pay the note and that he and Ladd wanted to make an arrangement whereby the Company could pay the note in monthly installments. In this conversation, Martin did not make a definite proposal as to the terms of the contemplated arrangement. He said he was leaving the details of the matter to Ladd. Afterwards, precise date not shown, Ladd went to see Hamilton at the bank and said to him, in substance, that the Hub Company was unable to pay the note and that he, Ladd, wanted to make an arrangement whereby the Company could pay the note in monthly installments of $200 each, beginning May 1, 1933, and he requested Hamilton to submit this proposal to Mrs. Anderson. The next conversation occurred on March 7, 1933, when Ladd and Martin went together to the bank and talked with Hamilton about the note. The substance of this conversation was materially the same as the previous conversation between Ladd and Hamilton. Shortly after March 7th, Mrs. Anderson refused to accede to the proposed arrangement. In short, no agreement was ever reached regarding payment of the note in monthly installments. The trial court submitted to the jury, among many others, the following Special Issues:

"Question Ten: Do you find from a preponderance of the evidence that W. T. Ladd, *on or about* March 1, 1933, requested of J. B. Hamilton additional time in which to pay the note due March 1, 1933?" (Emphasis ours.)

"Question Eleven: Do you find from a preponderance of the evidence that B. H. Martin on or about March 1, 1933, requested of J. B. Hamilton additional time in which to pay the note due March 1, 1933?"

"Question Twelve: Do you find from a preponderance of the evidence that W. T. Ladd, on or about March 7, 1933, requested

of J. B. Hamilton additional time in which to pay the note due March 1, 1933?"

The jury answered each of these questions in the affirmative. It is to be noted that the answers of the jury to Special Issues 10 and 11 do not show whether the respective requests of Ladd and Martin occurred before or after the note fell due.

With the foregoing facts held in mind, the provisions of the Negotiable Instruments Law bearing on the subject of presentment for payment and notice of dishonor will now be examined. Section 72, Article 5937, provides for presentment of a note for payment "to the person primarily liable on the instrument." Section 82 of the same article provides: "Presentment for payment is dispensed with * * * (3) by waiver of presentment, express or implied." Section 83 of the same article provides that "the instrument is dishonored when * * * presentment is excused and the instrument is overdue and unpaid." Section 89, Article 5938, provides: "Except as herein otherwise provided, when a negotiable instrument has been dishonored by non-acceptance or non-payment, notice of dishonor must be given to the drawer and each indorser, and any drawer or indorser to whom such notice is not given is discharged." Section 109 provides: "Notice of dishonor may be waived, either before the time of giving notice has arrived or after the omission to give due notice, and the waiver may be express or implied."

4 It is to be observed that by the terms of the statutes both presentment for payment and notice of dishonor may be waived, and that the waiver may be either express or implied. In Farmers & Mechancs' National Bank v. Head, (Com. App.) 7 S. W. (2d) 63, the legal qualities of a waiver and the mode of signifying the waiver are carefully and accurately explained. The court said:

"Viewed, as it should be, as a question of waiver as contra-distinguished from estoppel or new promise, there is nothing in the statute to support the contention or holding that a waiver can only be shown by an 'unconditional promise to pay,' or, indeed, that the acts relied upon 'must be clear and unequivocal.' The language of the statute is that such waiver 'may be express or implied.' So that, if the conduct or act relied upon tends to show a waiver, a question of fact for the jury arises, and if the intention is expressed or clearly implied it becomes a question of law for the court, for what is implied in a contract is as much a part of it as that which is expressed.

" * * *

"The authorities abundantly show that an indorser may waive

the failure to give notice of non-payment in a variety of ways short of an unconditional promise to pay. Thus, a request for forbearance (Gove v. Vining, 7 Metc. (Mass.) 212, 39 Am. Dec. 770), a partial payment after maturity (Perry v. Rhodes, 19 Fed. Case 295, No. 11011; Curtiss v. Martin, 20 Ill. 557; Lane v. Steward, 20 Me. 98) may constitute a waiver. * * * Indeed, an unconditional promise to pay makes a new contract, whereas the waiver of a ground of discharge does not. The two things are different in their form and essence. The true test is the intention of the indorser. Whatever the act or conduct relied upon as a waiver, if it constitutes a clear recognition of a continued liability (First National Bank of Hastings v. Bonner, (Tex. Civ. App.) 27 S. W. 698) or reasonably is such as to induce the conclusion that such waiver was intended (Linthicum v. Bagsby, 131 Md. 644, 102 Atl. 997), or to evidence a willingness of the indorser to be bound by the contract notwithstanding the laches of the holder (Thompson v. Curry, 79 W. Va. 771, 91 S. E. 801), or the use of words showing a clear intention to pay (Doherty v. First Nat. Bank of Louisville, 170 Ky. 810, 186 S. W. 937), it will constitute a waiver. · " * * *

"A waiver, as such must be distinguished from ordinary estoppel in pais, for it is not essential to the former that the opposite party do anything whatever upon the strength of the statement or act relied upon as constituting a waiver. It is like the legal concept of election of remedies. The indorser upon the failure to receive notice is given the choice to be discharged from liability or to continue to recognize liability and be bound upon the instrument, and, having made the choice of the latter, there is a waiver independent of any principle of estoppel and independent of whether or not there has been a new promise which, of itself, would support an action."

As seen, the legal conception of a waiver does not include any contractual element. Although the decision quoted from was made with reference primarily to notice of dishonor, there is no reason to say that the legal qualities of a waiver, as applied to the matter of presentment for payment, or the mode of signifying the waiver, are not the same in one case as the other. As we have seen, in both instances the relevant statutes provide for a waiver which may be either express or implied. The only difference in the wording of the statutes (sections 82 and 109), with respect to waiver, relates to the matter of time when the waiver may be made. What legal significance this difference of wording may have we shall not decide now. At any rate, by virtue of the statutes, an indorser of a note may, before same

matures, impliedly waive both presentment for payment and notice of dishonor, and the waiver will be effective. Moreover, we are of the opinion that the evidence conclusively shows such a waiver on the part of Ladd and Martin, both as individuals and as executors of the Turner Estate. The letter written by Ladd to Mrs. Anderson on February 20, 1933, discloses a request for Mrs. Anderson to forbear demanding payment of the note at the time it was to become due. He asked Mrs. Anderson to instruct her collecting agent (the First National Bank) "to advance same about May 1" and distinctly indicated, by the following language, the purpose such forbearance would serve: "I feel quite sure that I can arrange at least to pay part of same by that date and perhaps monthly payments until same is fully retired." This request for forbearance implied a waiver of presentment and notice. Gove v. Vining, 7 Metc. (Mass.) 212, 39 Am. Dec. 770. The testimony in the case shows conclusively that Martin also is chargeable with the effects of such waiver. His own testimony shows that he intrusted to Ladd the matter of negotiating for an extension of time for payment of the note. The trial court did not commit error in rendering judgment against Ladd and Martin and the Turner Estate on the note.

5   The contention of all the indorsers, which is to the effect that all of them have been discharged from liability on the other three notes, will now be taken up. As we have already shown, this suit was instituted by the indorsers on March 27, 1933, for the cancellation of their indorsements on all four of the renewal notes. On April 1, 1933, Mrs. Anderson filed answer in the suit, in which she declared the three unmatured notes due, and set up a cross action seeking recovery on all four notes. The indorsers contend that because she did not formally present the three notes to the Hub Company for payment when she declared them due, or at any time afterwards, and give the indorsers formal notice of dishonor, the indorsers were discharged from liability on the three notes. This contention is overruled. The institution of the suit by the indorsers for the cancellation of their respective indorsement contracts was a repudiation of such contracts and implied a waiver of the benefit of the terms thereof relating to presentment for payment and notice of dishonor. Sunlite Co. etc. v. Justice, 257 S. W. 579.

The judgment of the Court of Civil Appeals is reversed and that of the trial court is in all respects affirmed.

Opinion adopted by the Supreme Court April 20, 1938.

Rehearing overruled May 18, 1938.