### LANGLEY v. NORRIS.
#### No. 2315.

Court of Civil Appeals of Texas. Eastland.
Nov. 27, 1942.

Rehearing Denied Jan. 8, 1943.

604

Sullivan & Sullivan, of Big Spring, for appellant.

Culbertson, Morgan, Christopher & Bailey, of Fort Worth, Thomas & Thomas, of Big Spring, Justice, Moore & Justice, of Athens, and Joe W. Burrell, of Big Spring, for appellee.

LESLIE, Chief Justice.

W. A. Langley instituted this suit in trespass to try title against John Norris, the defendant, who answered not guilty and filed a cross action impleading L. S. Mitchell and wife, Gladys Mitchell, Frank A. Baggett and his wife, Ellen Baggett, who had conveyed the land in question to Langley on April 6, 1940. Norris alleged that prior to that conveyance he had contracted in writing on September 16, 1939, to purchase the land from cross-defendants, who had mutually obligated themselves to convey the same to him. Norris alleged he was at all times ready, able and willing to perform his contract with Mitchells and Baggetts, and that plaintiff before he took said conveyance April 6th had notice of his (Norris') contract (of September 16th) and his claims thereunder. He sought specific performance of his contract against Langley, as well as cross defendants, the common grantors.

Trial was before court and jury, and on answers of latter to special issues, judgment was rendered for Norris, cancelling Langley's deed from Mitchells et al. and for

specific performance of Norris' contract. Mitchells and Baggetts do not appeal. Appellant Langley presents 23 points or assignments of error. Several of them may be grouped and considered together, since each for a different reason attacks the same alleged vice or ruling.

The first point asserts the trial court erred in overruling appellant's motion for instructed verdict for five different reasons, namely, because the evidence "clearly showed":

(A) Legal title to the land in controversy had vested in Plaintiff Langley under such circumstances making it superior to any claim asserted by Norris.

(B) The contract between Norris and his co-defendants, Mitchells and Baggetts, lacked mutuality.

(C) That Norris at no time had equitable title to the land.

(D) That defendant Norris was never ready, able and willing to perform.

(E) That defendant Norris never at any time made to Mitchells and Baggetts a legal tender of the purchase price.

We do not think the testimony conclusively establishes any of these contentions, but to determine these and other questions raised, it becomes necessary to state in substance the facts of this litigation:

September 16, 1939, Ellen Baggett, Frank A. Baggett, Gladys Mitchell and L. S. Mitchell entered into a written contract with J. E. Norris, by virtue of which they agreed to convey Norris the land involved. The contract contained several provisions, and those pertinent to questions raised will be referred to under appropriate propositions.

The contract stipulated it was to become "null and void" on and after November 2, 1939, if not complied with. The appellant asserted time to be of the essence of the contract. Norris denied this and alleged that, if it were such, Mitchells and Baggetts waived such time limitation, if any, and agreed to extended time of performance of the original contract, and that they were estopped by their conduct to insist on such contention. He further alleged that Langley, before receiving his deed, knew of such agreements, as well as the facts of waiver and estoppel.

In response to the issues submitted, the jury found:

Issue 1. "That at the time W. A. Langley acquired his deed, John Norris was still claiming that he had the right to purchase the land under his contract."

Issue 2. "That at the time W. A. Langley acquired his deed, he knew that John Norris was still claiming that he had the right to purchase the land under his contract. * * *."

Issue 3. That "the parties did not intend that everything necessary to be done should be completed and the sale closed by November 2, 1939."

Issue 4. "That L. S. Mitchell was authorized to act for his wife and for Frank A. Baggett and wife, Ellen Baggett, when he wrote Norris the letter November 15, 1939, giving him a reasonable time in which to complete the contract."

Issue 5. "That by their course of dealing with Norris, the Defendants, Gladys Mitchell and Frank A. Baggett and wife lead him to believe that L. S. Mitchell had authority from them to give him a reasonable time in which to complete the contract of sale."

Issue 6. "That after Norris received the letter from L. S. Mitchell November 15, 1939, giving him a reasonable time in which to complete the contract, he made valuable improvements upon the land."

Issue 7. "That Norris relied upon the letter of November 15, 1939, giving him a reasonable time in which to complete the contract when he put improvements upon the place * * *."

Issue 8. "That the Defendants, L. S. Mitchell and Gladys Mitchell and Frank A. Baggett and Ellen Baggett treated the original contract between them and Norris as being in force and effect after November 2, 1939."

Issue 9. "That the parties after November 2, 1939, intended that the time limit as expressed in the original contract of sale * * * should no longer be in force and effect."

Issue 10. "That by their course of dealing after November 2, 1939, the Defendants, L. S. Mitchell, Gladys Mitchell, Frank A. Baggett, and Ellen Baggett, lead Norris to believe that they did not intend to enforce the time limit in the original contract between them * * *."

Issue 10–A. "That Norris offered within a reasonable time after November 2,

1939, to pay the Mitchells and Baggetts for all the land in question under fence."

Issue 11. "That at the time Norris offered, within a reasonable time after November 2, 1939, to pay the Mitchells and Baggetts for all of the land in question under fence * * * the said Norris had made arrangements to pay for such land and was financially able to do so."

Issue 12. "That Norris' offer within a reasonable time after November 2, 1939, to pay the Mitchells and Baggetts for the number of acres of land to which they could give good title."

Issue 12-A. "That at the time Norris offered, within a reasonable time after November 2, 1939, to pay the Mitchells and Baggetts for the number of acres of land to which they could give good title * * had made arrangements to pay for such good (title) land and financially able to do so."

Issue 13. "That the Mitchells and Baggetts, before the date of the deed to Langley, refused to deed Norris the 548 acres at $15.00 per acre unless he would also accept the 71.8 acres, the title to which was in dispute."

Issue 14. "That W. A. Langley, the Plaintiff herein, had notice of any extension of time * * * for the performance of the contract dated September 16, 1939, by and between L. S. Mitchell et al. and John Norris."

Issue 15. That John Norris, the Defendant herein made no "representations to W. A. Langley, the Plaintiff herein, on or about the first day of April, 1940, that he, the said John Norris, was making no further claims under his contract to the land in question."

Issue 16. That John Norris "did not abandon his claim under the contract for the land in question on or before the 6th day of April, 1940."

These findings are supported by the testimony, some of which is as follows:

Lee S. Mitchell, an attorney and party to this litigation, and who represented his wife and the Baggetts in negotiating this deal, wrote Norris March 4, 1940, apparently extending time for the performance of the contract. In that letter he wrote in part: "This will confirm conversation had with you Saturday, March 2, 1940, at which time I agreed to allow until next Saturday, March 9, 1940, to post the full purchase price of our sec-

tion 32 * * *. This will be authority for the First National Bank * * * to accept deposit of $9300.00 and hold subject only to valid subsisting lien and the delivery over of our duly executed deed of conveyance * * * *."

November 3, 1939, Mitchell wrote Norris: "Your letter concerning abstract and extension of agreement to November 15th was forwarded to me here. It is OK for you to have the extension and I wish you success in your financing."

November 15, 1939, Mitchell again wrote Norris: "Please let me know how your loan negotiations are progressing. As I have told you before, we wish to allow you a reasonable time for exercising out your plan, but we still wish to sell the place just as soon as possible at the price asked. We have a cash offer and I think it will meet the price offered. After all, our price was on a quick cash basis. Le me hear from you."

As late as January 31, 1940, Mitchell wrote Norris:

"With due consideration given because of the weather, it seems that Mr. Baker (a surveyor) could have done the work in in the two weeks since I was there.

"You have spent time and money working up your end of the deal, and I am sure you want the place, but unless I hear by Monday that something has been done on the survey and that the deal can be closed by February 15th, I must consider that the deal is off, so please advise me immediately."

On April 1, 1940, Ira L. Thurman, cashier of the bank at Big Spring, wrote L. S. Mitchell in behalf of Norris, stating: "Mr. J. E. Norris, against whom you hold a contract on certain real estate, has arranged to pay you off in full as soon as you are able to comply with the terms of the contract. You may send your papers here for collection and they will be remitted for just as soon as the title has been passed on and approved."

The letter referring to "Mr. Baker" was in response to one written by Norris to Mitchell February 4, 1940. In that letter Norris referred to Mitchell's letter of January 31st and wrote in part:

"I have been to see Mr. Baker five times since you were here. We had about three days last week suitable weather to work outside. I went to see him and gave him your letter and he told me he would write

you that night. I was under the impression you wanted Mr. Baker to finish the work as he had started it. But if you want someone else I can get Mr. Strahan if you want him. If I had not wanted the place I would not have signed the contract nor spent the money I have spent to get the loan through, and it is no fault of mine that deal has not been closed sometime ago.

"But if you want to go on and close the deal by February 15th for what the field notes call for, I will have the deed drawn up and as soon as it has been properly signed and sent to the bank, they will pay the money over. Please let me hear from you by return mail."

On the question of appellant's knowledge concerning the contract between Mitchell et al. and Norris and the claims of Norris thereunder, the record discloses the following:

The Honorable M. H. Morrison, attorney, testified that Mitchell and Langley came to his office in March, 1940, to discuss an affidavit concerning the Mitchell-Norris deal, and which affidavit Norris had made, acknowledged and put of record in the Deed Records of Howard County. The affidavit made specific references to the contract between Mitchell and Norris of date September 16th and stated Norris' claim of right to purchase the land, of which he was then in possession. Judge Morrison testified in part concerning that conversation: "I believe Mr. Mitchell said the contract had expired—I asked him—I wasn't interested in the matter, but he kept on and kept on and kept on and so I made the remark: 'well, you have extended the time', and he said there wasn't any contract. I said 'you wrote him a letter extending the time', and Mr. *Langley stated that the contract had not been carried out and he was willing to accept the land with the title as it was."* (Italics ours.)

Langley's knowledge of Norris' contract and the alleged extensions thereof is further reflected in the letter he wrote to Mitchell March 30, 1940, in which he stated: "Mr. Norris is claiming that he has *the money in the bank ready for delivery* when he gets the deed. I am determining this and of course I don't think there is anything in this, but I intend to see him Sunday and iron this out with him." Langley wrote that letter on his attorney's stationery.

Walter Bishop testified that in a conversation with Langley the morning before the deal Langley told him that he had gone to town that morning to force Norris to go through with the deal or give it up.

Further, the contract between Langley and the Mitchells and Baggetts shows that he was taking the land (embraced by Norris' contract) subject to good title as to the 71.8 acres thereof, and that a suit would be necessary to clear the title to that part at least. He agreed to cooperate with them in the prosecution of such suit and if it was unsuccessful and the title to the 71.8 acres could not be cleared he obligated himself to reconvey the same. That contract evidences an admission by the common grantors that a merchantable title to all the land contracted for by Norris was never tendered. This may in some measure account for grantors' indulgencies reflected by this record.

It thus appears Langley bought the land knowing he would have two law suits, one to clear title to the 71.8 acres or reconvey it all, and the other to eliminate by litigation the claims of Norris.

█ Under the above facts and findings we conclude that the appellant Langley had actual and constructive knowledge of the rights and claims of appellee Norris, and that he, Langley, took only such title as Mitchells and Baggetts had, which was burdened with their contract with Norris.

█ The rule of law applicable to such facts is stated in 43 Tex.Jur. page 614, Sec. 361, as follows: "Ordinarily the purchaser takes only the rights and title of his vendor, and as between conflicting purchasers he who has the earlier claim in point of time has the superior right."

█ Also in the text at Sec. 365: "One who acquires a claim to property for the purpose of asserting title to it in judicial proceedings cannot be deemed a bona fide purchaser. And one who has knowledge or notice of facts sufficient to put a prudent man on inquiry is not a bona fide purchaser where a proper inquiry would have disclosed an adverse right and he failed to make such inquiry."

Employing same rule under like circumstances: Heard v. Bowen, Tex.Civ. App., 184 S.W. 234, writ refused; American National Insurance Company v. Bass, Tex.Civ.App., 111 S.W.2d 769, writ dismissed; Houghton v. Marshall, 31 Tex.

196; Patrick v. Badger, Tex.Civ.App., 41 S.W. 538.

On the question of appellant's right and duty to plead innocent purchaser, which he did not do, see Martinez v. Bruni, Tex. Civ.App., 216 S.W. 655, 663. As stated, however, the proof and verdict show he was not such.

For the legal consequences, with respect to notice, of Langley's taking a conveyance of the land which was then in possession and use of Norris, see Permian v. Smith, 129 Tex. 413, 107 S.W.2d 564, 569, 111 A.L.R. 1152; Boedefeld v. Johnson, Tex.Civ.App., 201 S.W. 1027.

The foregoing adversely disposes of all points made by appellant in his brief to the effect that he was not bound by the contracts and agreements and letters that passed between appellee Norris and the common grantors, Mitchells and Baggetts.

Further, the contentions that the evidence conclusively showed Norris had no equitable title to the land must be overruled. He had the contract of September 16th. It specified the deal would be closed by November 2, 1939, but the jury in response to special issues found under proper pleadings and testimony that the parties did not regard time as the essence of the contract. Also, that the same had been extended by agreement to afford Norris an opportunity to discharge his obligations thereunder, and that he met such requirements within a reasonable time after the granting of such extensions, as may be seen from the jury verdict above stated.

That Norris held equitable title cannot be doubted. As held in Alworth v. Ellison, Tex.Civ.App., 27 S.W.2d 639, 640, writ refused: "A person who possesses the right to have the legal title to property transferred to him upon the performance of specified conditions has the equitable title to the property."

For other applications of the rules under like circumstances, see American National Insurance Co. v. Bass, Tex.Civ.App., 111 S. W.2d 769, 771; Pevehouse v. Oliver Farm Equipment Sales Co., Tex.Civ.App., 114 S. W.2d 658; Sanderson v. Sanderson, Tex. Civ.App., 82 S.W.2d 1008; 43 Tex.Jur. page 241, Sec. 146.

The further contentions that Norris was not ready, able and willing to pay for the land under the terms of his contract must be overruled. The verdict of the jury based on a sufficient testimony finds that he was ready, able and willing, and that finding is not challenged by any assignment of error properly presented.

His offer on different occasions to comply with his contract fully meets the requirements laid down in such authority as Poff v. Miller, Tex.Com.App., 235 S.W. 570; 40 Tex.Jur. page 851. There is no validity in contentions that he made no tender or offer in specie as such.

Langley's contentions that there was no consideration to support the contract with Norris for the extensions given him by the common grantors must also be overruled. The appellant raises no such issues by proper pleadings as required by Civil Procedure Rules Nos. 93 and 94.

Further, it has been held that an agreement extending performance of an executory contract under such circumstances does not require any additional consideration. Lewis Bros. v. Pendleton, Tex.Civ. App., 227 S.W. 502; Lane et al. v. Scott, 57 Tex. 367; Caples v. Port Huron, E. & T. Co., 61 Tex.Civ.App. 646, 131 S.W. 303.

The appellant vigorously insisted that the uncontroverted evidence shows that the contract between Norris and his cross defendants, Mitchells and Baggetts, lacked mutuality and, therefore, availed Norris nothing.

The testimony and especially the various exhibits reflecting the contract, letters of the parties, etc., evidencing extension agreements, show the history of this transaction down to Langley's receipt of his deed April 6, 1940. Mutuality is provided by the promise of one party as consideration for the promise of the other. Under the testimony in this case, it may be held, as in Texas Farm Bureau v. Stovall, 113 Tex. 273, 253 S.W. 1101, 1106, in an opinion by Chief Judge Cureton: "that the promises in the agreement are mutual, that there is an ample valid consideration, and that the contract is not subject to the criticism that it lacks in mutuality or is unilateral."

Such principle obtains as to the executory contract evidencing an extension of the original.

In weighing this attack against the judgment, it must be remembered that Norris, under the extended terms of the contract, performed and offered to perform and was able financially to pay for the land while his grantors still treated

the contract as being in force. The jury verdict so finds, and further, that Norris would have paid all of the purchase price of the 548 acres disclosed by the survey to be in Sec. 32, but that Mitchells and Baggetts refused to deed same to him, unless he would take the 71.8 acres more, the title of which was in bona fide dispute. Obviously Norris was required to do no more, and the refusal to perform by Mitchells and Baggetts relieved him of further offer of performance and matured his rights under the contract generally. That is, Norris did all his contract required of him, except to actually pay over the cash for the whole tract and was financially able to do that when the title was clear, as the verdict establishes. In that situation each could inforce performance, since Norris offered to pay while the contract was in force.

■ It is deemed unnecessary to enter into any extended discussion distinguishing between mutuality of obligation and mutuality of remedy, but what has been said demonstrates that Norris was entitled to specific performance of his contract as the judgment in the trial court decrees.

For authorities supporting this conclusion under the facts, as well as pointing out the distinction between mutuality of obligation and mutuality of remedy, see the following: Texas Farm Bureau v. Stovall, supra; Hazzard v. Morrison, Tex.Civ.App., 130 S.W. 244, 248, affirmed by Supreme Court 104 Tex. 589, 143 S.W. 142; Sanderson v. Sanderson, Tex.Civ.App., 82 S. W.2d 1008; Townsend v. Milliken, Tex. Civ.App., 294 S.W. 938; affirmed, Tex. Com.App., 16 S.W.2d 259; Naylor v. Parker, Tex.Civ.App. 139 S.W. 93.

■ There is no merit in any objection to the judgment on account of parties. Norris made all his grantors (Mitchells and Baggetts), as well as Langley, parties to the suit. Hence, there could arise no valid point as that the grantors did not own the land at the time suit was filed and judgment taken. It appears that Norris could have sued Langley alone, and sought specific performance under the authority of Hart v. Wilson, Tex.Civ.App., 281 S. W. 339. On the other hand, in Campbell v. McFadden, 9 Tex.Civ.App. 379, 31 S. W. 436, 445, similar to the instant case, it was held: "In actions for specific performance of contracts concerning real estate, the necessary parties defendant are the maker of the contract and his vendees The holding in Hart v. Wilson meets the approval of the Supreme Court, but either rule applied in this case catches appellant Langley since all are made parties.

■ In parts of appellant's brief he attempts to raise in this court, for the first time, the question of Norris' right to enforce the contract of September 16th as against married women. There is no pleading of such issue, and it was, therefore, waived as a matter of law. Phelps v. Brackett, 24 Tex. 236. The contention is here suggested in a collateral way in the argument under a different point, namely point 1.

Further, the Mitchells and Baggetts did not raise the question or suggest it in the trial court, and there is no proof that the land was the separate property of the wives. Assuming there was any such proof, no such issue was raised by the pleadings, and no such issues requested to be submitted.

Concerning conveyances, there is a marked distinction between contracts involving the sale of a homestead by husband and wife and those involving the sale of separate non-homestead property. See Angier v. Coward, 79 Tex. 551, 15 S.W. 698, and authorities therein cited.

By a group of propositions appellant Langley insists that in the contract between Norris and Mitchell et al. time was of the essence of the contract and that the same should have been performed by Norris on or before November 2, 1939. The appellee insists the time was not of the essence of the contract. The facts bearing upon such contentions are somewhat numerous and in some respects peculiar. The contract between Norris and the Mitchells and Baggetts provided in part as follows:

(1) As soon as the contract was executed Norris was to apply to a loan company affiliated with the FHA for an eighty per cent loan and if such loan company agreed to make the loan, then

(2) The grantors (Mitchells and Baggetts) were to furnish abstract of title to said land, showing themselves to hold good and merchantable title to said land, and

(3) Norris would then put the abstract in the hands of said loan company for examination, and

(4) In the event loan company pointed out defects the grantors would correct them within a reasonable time, and

(5) When the defects were corrected grantors would execute a deed and such other documents necessary to enable Norris to get the loan, and

(6) Norris would then execute notes and loan papers and pay the difference in cash.

(7) The contract purports to have been prepared September 16, 1939, but was signed by grantors on October 3 and 5, 1939.

October 16, 1939, the Great American Life Underwriters, Inc., filed application with the FHA for approval of its commitment to make said loan to Norris. Norris followed up that application by telegram to the Great American on October 19, 1939, and received a favorable reply on the same date. The FHA's approval was dated November 13, 1939. November 17, 1939, the Great American wired that the loan had been approved by the FHA and the telegram was followed by a letter confirming the same. On November 21, 1939, Bickle advised the Loan Company that James T. Brooks, attorney of Big Spring, had the abstract for examination. November 19, 1939, Norris wrote Mitchell requesting a deed, stating: "The loan was approved for $8400.-00. As soon as the deed is executed I can pay you. The abstract has been brought down to date and will be ready by the time the deed gets back."

December 15, 1939, Bickle reported to the Loan Company that the survey disclosed a shortage in acreage. March 16, 1940, the Loan Company notified Norris it had cancelled its commitment because of the shortage in acreage, and stated in its letter to Bickle of March 21, 1940, that it did so "because the seller would be unable to give Mr. Norris a good title to this entire tract * * *." The letter further stated that the tract would probably "fall short about 70 acres." November 17, 1939, Bickle advised the Great American that Norris "agrees to accept the $8400.00 loan * * *."

There was considerable correspondence relating to this deal, but the above is the most material. The statements just made and those in earlier part of this opinion are pertinent to a number of appellant's propositions, and especially the contention that time was of the essence of the contract.

In the meantime Mitchell had been to San Antonio endeavoring to push the loan through so Norris could get the land. While on the witness stand he testified in part as follows:

"Q. Your contract with Mr. Norris provided that he would make a FHA loan. As a lawyer, you are, of course, familiar with the law that the FHA makes no loan except for the construction of houses. You are familiar with that law, aren't you? A. Generally, I am, Yes.

"Q. You supposed that to be true in this instance, didn't you? A. I presume so, Yes.

"Q. Approximately when did you learn, if you did learn, who made the commitment for a loan in this case? A. Oh, I guess Mr. Norris told me, he or Henry Bickle.

"Q. Do you know when that occurred, say, with reference to the conversation which the testimony showed yesterday took place in Judge Brooks' office? Do you know about when you learned it with reference to that time? A. Do you want to know when I learned the Great American Life Insurance Company * * *?

"Q. Yes. A. I guess Mr. Norris and Bickle told me probably in December."

Mr. Mitchell further testified the deal "had stuck up and bogged down"; that he told the loan company "Mr. Norris wanted to get the thing closed as quickly as he could, and so did he." Touching upon the efforts of both to conclude the deal, Mitchell was asked:

"Q. Do you know of anything that you could have done in the meantime that would have speeded up the clearing up of the title to February, when you were making that survey? A. I had the thing up with the land commissioner and I was trying to dig up the conflict out there so I could get the record patent.

"Q. Do you know anything now that you could have done to clear up the title on that land? A. I don't think so.

"Q. Do you know anything then, that you could have done then to speed it up? A. No.

"Q. Do you know anything that Mr. Norris could have done to have speeded up his part of the transaction? A. I wouldn't say that, unless he would have stayed behind his loan and kept his people posted as to what the circumstances were.

"Q. It couldn't have been closed under the circumstances. A. Not for the full amount, No.

"Q. * * * You were satisfied at that time he was doing the best he could do and you were trying to push him along? A. I thought so."

Obviously, the common grantors intended all the while to give Norris a reasonable length of time to complete the transaction and realized fully that he was making a bona fide effort to do so. The enumerated facts and circumstances give ample support to the jury's answer to Issue No. 3, "That the parties did not intend that everything necessary to be done should be completed and the deal closed by November 2, 1939," as well as its answer to Issue No. 8 "that they treated the contract as being in full effect after November 2, 1939."

A somewhat peculiar but very significant feature of the contract Mitchells and Baggetts made with Norris is that it contemplated at least one method that would enable him to pay the consideration in part, namely, that he would procure a loan and build a residence on said property, all of which would have to be done before the FHA loan could be closed. There is nothing to indicate the length of time necessary to complete such structure and this circumstance arises from the face of the contract as well as the implications of time necessary to furnish abstract, examine same, make surveys and otherwise perfect the title in respect to the deficiencies reflected by this record.

■ In Investors' Utility Corporation v. Challacombe, Tex.Civ.App., 39 S.W.2d 175, 178, the applicable rule is stated thus: "Was time of the essence of the contract? At common law the general rule was that a time stipulated in the contract for its performance was of its essence, unless a contrary intent appeared from the face thereof. In equity, time was not considered as of the essence of the contract, unless it affirmatively appeared that the parties so regarded it. Under the modern rule, whether time is of the essence of the contract is dependent upon its provisions, purpose, and the surrounding circumstances, showing the intention of the parties that the contract must be performed at or within a given time. 13 C.J. 686, § 783; 10 Tex. Jur. 417, § 239."

■ It follows that if resort be had to the provisions of the contract, its purpose and the surrounding circumstances, it must be held that time was not of the essence of the contract between Norris and the Mitchells and Baggetts.

■ Although a contract which in express terms declares that time is of the essence, it is not necessarily so unless the parties intended it to be. That is the philosophy of the opinion of our Supreme Court by Judge Hickman in Williams v. Shamrock Oil Co., 128 Tex. 146, 95 S.W.2d 1292, 107 A.L.R. 269.

43 Tex.Jur. page 106, Sec. 67, reads as follows: "In harmony with the general rule for the construction of all contracts, a contract for the sale of land is construed as a whole. The agreement being in writing, the court will look to each and all of the parts of the instrument, as well as to the surrounding circumstances, and will endeavor to harmonize the various clauses and provisions, to the end that every part of the instrument may be given its proper effect. Accordingly a contract may not be paragraphed, and the dependent and related paragraphs construed without reference to each other."

The contract under consideration necessarily contemplated the doing of so many things, each of which was uncertain in consumption of time, it is not surprising that the jury found in answer to a special issue that the parties themselves did not intend that time should be of the essence of the contract.

■ Regardless of the conclusions expressed on the preceding point, and assuming that time was the essence of the contract, it is obvious from the statement of the record already made that the parties waived same and Mitchells and Baggetts are estopped to claim such, all of which was well known to Langley prior to his acceptance of his deed.

The appellee Norris fully alleged the facts constituting waiver, estoppel and knowledge on the part of Langley, and the jury found with him in answer to Issues 5, 6, 7, 8, and 10. The statement under the proposition immediately preceding this one supports the findings.

■ 10 Tex.Jur. page 427, Sec. 245, states applicable rule of law: "Provisions limiting the time for performance may be waived, even where time is of the essence of the contract * * *."

The legal effect of such indulgencies as those practised by the Mitchells and Bag-

getts toward Norris is clearly and fully set forth by this court in an opinion by Judge Funderburk in Buck v. DeShazo, Tex.Civ. App., 5 S.W.2d 878. See also Lester v. Hutson, Tex.Civ.App., 167 S.W. 321.

Further, the jury found that Norris relied upon these acts of his grantors recognizing his contract as in force and made valuable improvements on the place, which he would not have done but for such indulgencies. In all of this there is both waiver and estoppel as alleged.

As to appellant's contention that "waiver must either be supported by agreement founded upon a valuable consideration, or the act relied on as a waiver * * * be such as to estop a party from insisting on performance of the contract", our Supreme Court has held in Ladd v. Anderson, 131 Tex. 479, 115 S.W.2d 608, 613, 614:

"In Farmers' and Mechanics' National Bank v. Head, Tex.Com.App., 7 S.W.2d 61, 62, 63, the legal qualities of a waiver and the mode of signifying the waiver are carefully and accurately explained. The court said:

" 'Viewed, as it should be, as a question of waiver as contradistinguished from estoppel or new promise, there is nothing in the statute to support the contention or holding that a waiver can only be shown by an "unconditional promise to pay," or, indeed, that the acts relied upon "must be clear and unequivocal." The language of the statute is that such waiver "may be express or implied." So that, if the conduct or act relied upon tends to show a waiver, a question of fact for the jury arises, and if the intention is expressed or clearly implied it becomes a question of law for the court, for what is implied in a contract is as much a part of it as that which is expressed * * *.

" 'A waiver, as such, must be distinguished from ordinary estoppel in pais, for it is not essential to the former that the opposite party do anything whatever upon the strength of the statement or act relied upon as constituting a waiver. It is like the legal concept of election of remedies. The indorser upon the failure to receive notice is given the choice to be discharged from liability or to continue to recognize liability and be bound upon the instrument, and, having made the choice of the latter, there is a waiver independent of any principle of estoppel and independent of whether or not there has been a new promise which, of itself, would support an action.' "

No consideration was required. Equitable Life Assurance Society v. Ellis, 105 Tex. 526, 147 S.W. 1152.

The appellant's brief contains many other assignments of error, and each has been duly considered. All of them are overruled. For the reasons assigned the judgment of the trial court is affirmed.